**In re William P. HEFFERNAN, Carol Ann Heffernan, Debtors.**

**Bankruptcy No. 99–21782.**

United States Bankruptcy Court, D. Connecticut.

Dec. 27, 1999.

Gail S. Shaulys, Glastonbury, CT, for debtors.

Keith Costa, Senior Attorney, Patricia Beary, Assistant U.S. Trustee, Office of the United States Trustee, New Haven, CT, for Carolyn S. Schwartz, United States Trustee.

Roberta Napolitano, Bridgeport, CT, Chapter 7 Trustee.

*RULING ON UNITED STATES TRUST-
EE'S MOTION TO DISMISS DEBT-
ORS' BANKRUPTCY CASE FOR
SUBSTANTIAL ABUSE OF CHAP-
TER 7 PROVISIONS*

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

I.

The matter before the court is a motion of Carolyn S. Schwartz, United States

Trustee for Region 2 ("the UST") for dismissal of the joint Chapter 7 bankruptcy case of William P. Heffernan ("WH") and Carol Ann Heffernan ("CH") (together, "the debtors" or "the Heffernans"), pursuant to Bankruptcy Code § 707(b), for "substantial abuse" of Chapter 7 provisions. The court held a hearing on November 4, 1999, at which the debtors were the sole witnesses, testifying regarding their income, expenses and indebtedness. The debtors, apparently in their late 50's, are both employed as wage earners; their three children are adults, they have no other dependents, and they are solvent if their exempt assets are included. The court admitted into evidence a number of exhibits including: the debtors' Chapter 7 petition and related schedules of assets, liabilities, income and expenses; several credit card statements; a copy of the coverage page and statement of policy values for the debtors' life insurance policy; WH's 401(k) plan statement; and the debtors' federal income tax returns for 1995 and 1997. The testimony and exhibits will be discussed as they relate to the particular items at issue.

## II.

Section 707(b) provides that, "After notice and a hearing, the court, on its own motion or on a motion by the United States trustee ... may dismiss a case filed by an individual debtor under this chapter [7] whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor." The UST contends that the debtors have incurred primarily consumer debts and that their ability to repay a significant portion of their pre-petition debts out of their post-petition earnings makes their Chapter 7 filing a "substantial abuse" of that chapter, warranting dismissal. The debtors object to

the UST's motion on the grounds that § 707(b) was not intended to force debtors into Chapter 13; that the expenses shown on the debtors' amended bankruptcy schedules are reasonable and far from extravagant; and that the debtors' case does not warrant dismissal under the "totality of the circumstances" test adopted by the Second Circuit Court of Appeals.

### A. Primarily Consumer Debt

■ The debtors' bankruptcy schedules indicate secured claims of $170,510.13, consisting of first and second mortgages on their residence valued at $175,900.00; unsecured priority claims of $4,472.80 for delinquent taxes; and unsecured nonpriority claims of $123,842.92, attributable entirely to credit card debt. Of their total indebtedness of $298,825.85, the debtors have established that $22,475.00, owed to American Express, was incurred principally for WH's business travel expenses. The balance is "consumer debt," defined in the Bankruptcy Code § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose." *See, e.g. In re Vianese,* 192 B.R. 61 (Bankr.N.D.N.Y. 1996) (first mortgage, home equity loan, and loans for son's education were consumer debts, as were credit card debts incurred other than for business purposes). Because more than 90% of the debtors' total indebtedness is consumer debt, the court concludes that the threshold requirement of § 707(b), that the debtors' are individuals whose debts are "primarily consumer debts" is satisfied.

### B. Substantial Abuse Test

■ The Second Circuit recently affirmed the use of a "totality of the circumstances" approach in determining whether to dismiss a case under § 707(b) for substantial abuse. *In re Kornfield,* 164 F.3d 778, 783 (2d Cir.1999). Noting that "a division among courts exists over the degree of emphasis to be placed on the abili-

ty of the debtor to repay debts out of future income," the Second Circuit declined to "spell out in greater detail the precise content of the proper totality of the circumstances test in this circuit," but agreed with the analysis of the bankruptcy court in *Kornfield* as being "well within the mainstream of analysis used by other circuits." *Id.* at 783–84. This court, therefore, will apply that approach, a two-part test, looking first to whether the debtors have the ability to pay a substantial dollar amount or percentage of their unsecured debts, and then to the totality of the circumstances to determine whether there were any mitigating or aggravating factors. *In re Carlton,* 211 B.R. 468, 477–78 (Bankr.W.D.N.Y.1997)

### C. Ability to Pay

■ In considering the debtors' ability to pay all or a portion of their indebtedness, the court looks to the "disposable income" that would be available to pay creditors under a hypothetical Chapter 13 plan. *See, e.g. In re Koch,* 109 F.3d 1285, 1288 (8th Cir.1997) ("[A]bility to pay for § 707(b) purposes is measured by evaluating Debtors' financial condition in a hypothetical Chapter 13 proceeding."). Bankruptcy Code § 1325(b)(2) defines disposable income for purposes of a consumer debtor Chapter 13 plan as "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance and support of the debtor or a dependent of the debtor. . . ." The court has examined the schedules of income (Ex. A, Schedule I) and expenses (Ex. C, amended Schedule J) filed and subsequently amended by the debtors with their Chapter 7 petition, as well as the testimony presented by the debtors, to determine the debtors' disposable income under a hypothetical Chapter 13 plan.

The debtors' schedules indicate that the debtors presently have a combined gross monthly income of $9,586.18 (Ex. A, Schedule I); that, after the payroll deductions indicated, their combined monthly take-home pay is $5,841.66 (Ex. A, Schedule I); and that their monthly expenses are $5,011.90 (Ex. C, amended Schedule J). Solely on the basis of the schedules submitted by the debtors, their disposable income is $829.76. The court finds that certain adjustments to that figure are necessary to determine the disposable income that would be available to pay creditors under a hypothetical Chapter 13 plan.

### Lunches

■ The UST argues that the $300 per month ($7.50 per person per weekday) the debtors scheduled for lunch expenses (Ex. C, amended Schedule J) is extravagant. As indicated from the bench, the court finds that this amount is not unreasonable, particularly since WH is expected to be away from home on business much of the time. No adjustment to disposable income is necessary for this item.

### Recreation/Entertainment

■ The UST also questioned the reasonableness of the debtors spending $190.37 (Ex. C, amended Schedule J) for "recreation, clubs and entertainment, newspapers, magazines, etc." CH testified that this amount included the costs of cable television, a subscription to the local newspaper, various magazines and books, and WH's golf fees, and that it would permit the debtors to go out for dinner and a movie once a month. The court concludes that such amounts are not extravagant, and that no adjustment is necessary for this item.

### Life Insurance

WH participates in group life insurance provided through his employer. Premiums for WH's group life and group health insurance are included in his $654.46

monthly payroll deduction for insurance. Neither of the debtors was aware of how much of this premium is attributable to the life insurance or of the amount of coverage provided.

■ In addition to the group life insurance, the debtors own an individual "flexible premium variable life insurance policy" which provides death benefits of $200,000 on WH and $50,000 on CH and under which premiums are invested in various fixed income and equity funds to provide a significant savings element, i.e., the policy value. (Ex. B.) The only argument the debtors offered to support inclusion of the premiums for this policy as necessary expenses was that its premiums were lower than those of a prior policy which it replaced. Even accepting the need for the additional insurance provided by this policy, the court cannot consider the "savings" portion of the premiums, the portion applied to increase the policy value, as an expense that is necessary for the support of the debtors. *See, e.g. In re Griffieth,* 209 B.R. 823, 828 n. 3 (Bankr.N.D.N.Y. 1996) (To the extent that life insurance premium payments are attributable to the savings or investment component of a whole life policy, they may not be excluded from disposable income.). The policy values shown in Exhibit B indicate that, in the 27 months from policy issue to the filing of the bankruptcy petition, the policy at issue accumulated a gross policy value in excess of $6,000. The court concludes that approximately $200 of the $300 monthly premium is attributable to the savings element of the policy, leaving approximately $100 to provide the pure term life insurance. Because savings are generally not deducted in determining the amount of a debtor's disposable income, $200 of the monthly premium deducted by the debtors will be added back.

### Student Loan

The debtors have included on their Schedule J a monthly expense of $105 for "Sallie Mae college loan." CH testified that much of the debt on a particular credit card the debtors incurred to pay for their children's college educations, but that the debtors had never taken any student loans under any government programs. The court concludes therefore that the amount shown for the "Sallie Mae college loan" was included in error and should be excluded. Disposable income should be increased by $105 per month on account of this adjustment.

### Delinquent Taxes

■ Debtors' expenses in Schedule J includes $230 per month for 1998 delinquent federal and state taxes. CH testified that approximately $30 of this amount was allocable to the state tax delinquency which now has been paid off. The remaining $200 per month will pay the amount owed to the IRS in full within two years. CH testified that, although both debtors claim no dependents for tax withholding purposes, the amount withheld is insufficient. Based on prior years' experience, the debtors have budgeted a monthly amount of $116.16 to establish a reserve to cover the expected deficiency for the current year. The court finds that, since the state tax delinquency no longer exists, the $30 per month expense for that purpose may be eliminated. The $200 per month for the federal tax delinquency, while it would pay down the amount owed in less than the 36 months applicable under a Chapter 13 plan, is not unreasonable. With regard to the reserve for underwithholding for the current year, the UST has not shown it to be unreasonable and the court, therefore, applying the presumption of § 707(b) in favor of the debtors, finds it reasonably necessary. Disposable income should be increased by $30 per month to reflect that the debtors are no longer delinquent in the payment of their state taxes.

*Retirement Savings Plans*

The debtors' income schedule (Schedule I, Ex. A) indicates payroll deductions of $629.02 for WH's repayment of a loan from his account under his employer's 401(k) plan, and $125 for CH's contribution to her employer's 403(b) plan.[1] Under such plans, often referred to as qualified tax-deferred retirement or savings plans, an employee may elect to set aside a portion of his or her current income, investing it on a tax-deferred basis, until retirement. A participant's contributions are allocated to his or her individual account and any loans from such accounts not repaid prior to distribution reduce the payout otherwise available.

■■■ "There is an overwhelming consensus among bankruptcy courts that a debtor's voluntary payment into a pension, savings, retirement or investment-type plan, such as a 401(k) plan, is not an expenditure reasonably necessary for a debtor's maintenance and support during the pendency of a Chapter 13 plan." *In re Johnson,* 241 B.R. 394 (Bankr.E.D.Tex. 1999); *See, also In re Anes,* 195 F.3d 177 (3d Cir.1999); *In re Harshbarger,* 66 F.3d 775 (6th Cir.1995); *In re Nation,* 236 B.R. 150 (Bankr.S.D.N.Y.1999); *In re Jaiyesimi,* 236 B.R. 145 (Bankr.S.D.N.Y.1999); *In re Delnero,* 191 B.R. 539 (Bankr. N.D.N.Y.1996); *In re Goewey,* 185 B.R. 444 (Bankr.N.D.N.Y.1995); *In re Moore,* 188 B.R. 671 (Bankr.D.Idaho 1995); *Cf. In re Villarie,* 648 F.2d 810 (2d Cir.1981) (holding, in a Chapter 7 case, that a debtor's loan from his pension fund "cannot give rise to a debt that can be discharged in bankruptcy."). The payroll deductions on account of the debtors' retirement plans, whether labeled contributions or loan payments, must be included in the debtors' disposable income. "If the Debtors do not make the proposed [loan] payments, the retirement systems will deduct the balance owed from their retirement accounts. The payments, even if classified as debt payments, therefore, will increase their retirement benefits rather than repay the retirement systems.... In effect, the payments are contributions to the debtors' retirement accounts. Voluntary contributions to retirement plans, however, are not reasonably necessary for a debtor's maintenance and support and must be made from disposable income." *In re Anes,* 195 F.3d 177 (3d Cir.1999) (citations omitted).[2]

The court concludes that the debtors' estimate of their disposable income should be increased by $125 per month to include the amount shown as CH's contribution to her employer's 403(b) plan, and further increased by $629.02 per month to include the amount shown as the payment for WH's 401(k) loan.

Summary of Adjustments to Disposable Income

| | | |
|---|---|---|
| Lunches: | | None |
| Recreation / Entertainment: | | None |
| Life Insurance: | + $ | 200.00 |
| Student Loan: | + | 105.00 |
| Delinquent taxes: | + | 30.00 |
| 401(k) Loan: | + | 629.02 |
| 403(b) Contribution: | + | 125.00 |
| | | |
| Total Adjustment | + | $1,089.02 |

■■■ This amount, when added to the $829.76 derived from Schedule I (Ex. A) and amended Schedule J (Ex. C) results in disposable income of $1,918.78. Under a hypothetical Chapter 13 plan, disposable income of $1,918.78 per month for 36 months may provide $69,076.08, 53.8% of the total unsecured debt of $128,315.72, for

---

1. As CH testified, the 403(b) plan is analogous to a 401(k) plan, but is for employees of nonprofit organizations. The references in the discussion to 401(k) plans, therefore, are equally relevant to 403(b) plans.

.2. That a debtor may suffer tax consequences as a result of not repaying a 401(k) loan does not alter this conclusion unless it can be shown that the tax consequences would adversely affect unsecured creditors. *In re Jaiyesimi,* 236 B.R. 145, 148–49 (Bankr.S.D.N.Y. 1999).

payment to unsecured creditors.[3] Such a plan would provide creditors both a substantial dollar amount and a significant percentage of their claims. In contrast, unsecured creditors would receive nothing if the debtors were granted a Chapter 7 discharge because the debtors have no nonexempt assets. The court concludes that the first prong of the test for substantial abuse, the debtors' ability to pay, has been satisfied.

### D. Other Relevant Circumstances

Under the totality of the circumstances approach adopted by the Second Circuit in *Kornfield*, in addition to considering a debtor's ability to pay a substantial part of unsecured debt, the court must consider whether there are any relevant mitigating or aggravating circumstances. *In re Kornfield*, 164 F.3d at 783. Although the Second Circuit declined to "spell out in greater detail the precise content of the proper totality of the circumstances test in this circuit," the test, as it is generally applied in those circuits which have adopted it, determines first whether a debtor has the ability to pay all or a portion of his or her indebtedness. If so, any other relevant circumstances are considered, on a case by case basis, to determine whether Chapter 7 relief may, nevertheless, be justified. *See, e.g. In re Stewart*, 175 F.3d 796, 809 (10th Cir.1999); *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991).

The UST does not allege that the debtors lacked good faith, either in filing their petition or in completing the schedules. They are facially entitled to some form of bankruptcy relief. The debtors attribute the onset of their financial difficulties to corporate downsizing, in October, 1995, by WH's employer. WH's position as vice president of sales was eliminated. Although he was immediately rehired as a training manager, his new position provided a lower salary, without the bonus and company car of his prior position. The debtors estimate the loss of income was approximately $51,000. The debtors incurred most of their indebtedness prior to WH's salary reduction, at a time when they expected to be able to repay it. The debtors made several attempts to manage their growing credit card debt prior to resorting to their bankruptcy filing. They placed a second mortgage on their house, borrowed from WH's 401(k) plan and consulted a credit counseling service which tried unsuccessfully to negotiate with their creditors. Thus, unlike the *Kornfeld* debtors whom the Court of Appeals stated had engaged in an "extravagant lifestyle" and could have "avoided" their debt, the Heffernans are clearly more representative of those petitioners who file bankruptcy cases because, as the debtors testified, as inept family money managers, they have waged a losing war with credit card debt.

The UST points out that the debtors are eligible for relief under Chapter 13; that they enjoy a relatively stable source of income; and that their debts are all well within the limits prescribed in Bankruptcy Code § 109(e) for Chapter 13 eligibility.[4] While relief under Chapter 13 is available only on a voluntary basis, its

---

**3.** After reduction for the Chapter 13 trustee's 10% fee, this amount would still provide $62,-168.47, 48.4% of total unsecured debt, for payment to unsecured creditors.

**4.** Bankruptcy Code § 109(e) provides:
(e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $269,250 and noncontingent, liquidated, secured debts of less than $807,750, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $269,250 and noncontingent, liquidated, secured debts of less than $807,750 may be a debtor under chapter 13 of this title.

availability as an alternative may be relevant to the determination of whether the Chapter 7 filing is a substantial abuse of that chapter. *See, e.g. In re Koch*, 109 F.3d 1285, 1290 (8th Cir.1997) ("Congress is free to limit Chapter 7 protection to truly needy debtors who cannot fund a Chapter 13 plan.... We conclude that Congress did just that when it enacted § 707(b)...."). The debtors' Chapter 7 filing was not precipitated by a "sudden illness, calamity, disability, or unemployment." *In re Green*, 934 F.2d 568, 572 (4th Cir.1991). Although they suffered a financial setback when WH's salary decreased, they continue to earn a substantial income of approximately $115,000 per year, which as noted in the foregoing discussion, should be sufficient to enable them to repay at least a portion of their indebtedness without undue hardship.

The debtors argue that they should not be forced to utilize a Chapter 13 plan to apply all of their disposable income to pay creditors. The debtors claim that, as a result of falling behind in their credit card payments, all of their credit cards have been canceled and that WH's job requires that he have funds available so that he can use his debit card to pay for his business travel expenses, which are subsequently reimbursed by his employer. The debtors argue that these expenses average about $5,000 per month, that employer reimbursement usually takes about a month, and that the debtors must be able to use their disposable income to build a fund to cover these expenses. In short, the Heffernans fear going into Chapter 13 will jeopardize WH's job.

The court finds this argument flawed and unpersuasive. Under the scenario presented by the debtors, WH's business travel expenses are eventually reimbursed, so they ultimately do not impact the amount of disposable income. In any given month, although WH may be expected to need about $5,000 to cover debit card expenditures for business travel, he can also expect to receive about $5,000 from his employer as reimbursement for travel expenses incurred during the previous month. Although WH testified that this arrangement has been effected, the court notes that the debtors' scheduled assets do not include an amount for employer travel reimbursement outstanding as of the petition date for travel expenses previously paid by WH from his debit card account. Crediting the debtors' testimony regarding the arrangement and assuming the omission was inadvertent, the court notes that the amount due from WH's employer in the first month post-petition would provide the cashflow necessary to cover that month's travel expenses.

As expenses are incurred and eventually reimbursed, these funds should roll over, remaining relatively stable. The court also notes that the debtors' schedules indicate sufficient funds available from other sources, e.g. the debtors amended Schedule B (Ex. C) lists savings accounts, life insurance policy values and pension funds, to temporarily cover any fluctuations. "A totality of the circumstances inquiry is equitable in nature and the existence of an asset, even if exempt from creditors, is relevant to a debtor's ability to pay his or her debts." *In re Kornfield*, 164 F.3d at 784.

### III.

### CONCLUSION

Considering the absence of mitigating factors and the availability of relief under Chapter 13, the court concludes that dismissal, under § 707(b), of the debtors' Chapter 7 case as a substantial abuse of that Chapter is warranted. If, at the expiration of 20 days after the date of this ruling, the debtors have not, pursuant to Bankruptcy Code § 706(a), voluntarily converted their Chapter 7 case to one un-

der Chapter 13, the court will grant the UST's motion to dismiss their case. It is

**SO ORDERED.**