**In re Omaya HADDAD, Debtor.**

**Bankruptcy No. 99–B–42180(AJG).**

United States Bankruptcy Court,
S.D. New York.

Feb. 22, 2000.

Jerome Lee Davidow, New York City, for Debtor.

Carolyn S. Schwartz, United States Trustee (Michelle N. Yu, Tracy Hope Davis, New York City, of counsel), for the debtor.

Weltman & Moskowitz, LLP (Michael L. Moskowitz, New York City, of counsel), for the United Nations Federal Credit Union.

Paul J. Hooten & Associates (William Martinson, Mt. Sinai, New York, of counsel), for the American Express Travel Related Services Company, Inc.

*MEMORANDUM DECISION, AFTER EVIDENTIARY HEARING, GRANTING UNITED STATES TRUSTEE'S MOTION TO DISMISS DEBTOR'S CHAPTER 7 PETITION, PURSUANT TO 11 U.S.C. § 707(b), AS CONSTITUTING A SUBSTANTIAL ABUSE OF THE PROVISIONS OF CHAPTER 7*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The Court has been asked to determine whether the petition filed under Chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") by Omaya Haddad (the "Debtor") should be dismissed as con-

stituting a substantial abuse of the provisions of that Chapter.

After conducting a two-day evidentiary hearing and considering the evidence adduced, the Court finds that the petition should be dismissed. Based on the totality of circumstances, affording the Debtor a chapter 7 discharge would be inequitable to her creditors and a substantial abuse of the provisions of chapter 7 of the Bankruptcy Code.

## DISCUSSION

11 U.S.C. § 707(b) provides:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

■ This Section was added to the Bankruptcy Code because of Congressional concern that "debtors who could over time easily pay their creditors might resort to Chapter 7 to erase their legitimate obligations." *Kornfield v. Schwartz (In re Kornfield)*, 164 F.3d 778, 781 (2nd Cir. 1999). Debtors obtain a "fresh start" through the discharge of all or some of their debts. *In re Krohn*, 886 F.2d 123, 125 (6th Cir.1989). Prior to the enactment

of § 707(b), debtors could obtain a fresh start under chapter 7 without restraint, in exchange for the liquidation of their nonexempt assets for the benefit of creditors. *Id.* at 126. Retailers and consumer lender sought enactment of legislation to curtail the number of chapter 7 petitions filed by "non-needy debtors," *Green v. Staples (In re Green)*, 934 F.2d 568, 570 (4th Cir.1991), that is, those debtors who had the ability to repay their debts but chose to unfairly take advantage of the discharge afforded by filing a chapter 7 petition. *First USA v. Lamanna*, 153 F.3d 1, 4 (1st Cir.1998). The enactment of § 707(b) placed a restraint on access to chapter 7 discharge by making bankruptcy courts "gatekeepers who could examine the worthiness of debtor petitions and dismiss those petitions deemed abusive." *Id.* at 3. Rather than intending to duplicate other Bankruptcy Code sections that require that a petition be filed in good faith, § 707(b) is calculated to ensure repayment of debts where such would not be burdensome. *Krohn*, 886 F.2d at 126. While a debtor in need of a fresh start may obtain such, a debtor cannot seek a "head start" if it results in inequitable treatment of creditors. *Id.* at 128.

■ Section 707(b) allows a court to dismiss a chapter 7 petition of an individual debtor with primarily consumer debts[1] if the court "finds that the granting of relief would be a substantial abuse." 11 U.S.C. § 707(b). However, the Bankruptcy Code does not define substantial abuse. *Kornfield*, 164 F.3d at 781. The determination not to set precise boundaries reflects the tension between the countervailing concerns of affording a debtor a fresh start and curtailing abuse of consumer credit. *Green*, 934 F.2d at 571.

■ In considering § 707(b) motions, "courts have generally adopted a 'totality of circumstances test' that seeks to ascertain whether the debtor is attempting to obtain an inequitable discharge at the ex-

---

**1.** The Bankruptcy Code defines consumer debt as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).

pense of his or her creditors." *Kornfield,* 164 F.3d at 781. The need to consider the totality of circumstances requires that a substantial abuse determination be made on a case-by-case basis. *Green,* 934 F.2d at 572. Applying a totality of the circumstances test comports with the presumption which favors granting the relief sought by the debtor. *Id.*

The Second Circuit rejected the proposition that a certain income level alone was sufficient to warrant dismissal of a chapter 7 petition. *Kornfield,* 164 F.3d at 783. Rather, the Second Circuit observed that any determination of a debtor's ability to pay would of necessity include a consideration of the debtor's personal circumstances. *Id.* at 781. Once viewed in the context of personal circumstances, the Second Circuit noted that some courts consider the debtor's ability to repay debts to be the dispositive factor in determining whether there is substantial abuse. *Kornfield,* 164 F.3d at 781. However, other courts, while considering the debtor's ability to repay debts to be an important factor, also consider many other factors. *Id.* The Second Circuit declined to set forth "in greater detail" the exact contours of a "proper totality of circumstances test" because it found that the debtors' petition before it would not qualify under any totality of circumstances test. *Kornfield,* 164 F.3d at 784.

In *Kornfield,* the Second Circuit also accepted the analysis applied by the bankruptcy court that had considered the petition filed by the Kornfields. The Second Circuit found that "the bankruptcy court ... applied a totality of circumstances test that was well within the mainstream of analysis used by other circuits." *Kornfield,* 164 F.3d at 783. The bankruptcy court in that case first detailed the three approaches that it recognized courts use in considering § 707(b) motions, and then attempted to apply a test that blended those three approaches. *In re Carlton,* 211 B.R. 468, 477–78 (Bankr.W.D.N.Y.1997). The bankruptcy court considered the debtors'

ability to repay their debts as the primary factor, it then considered a totality of circumstances test to determine whether there were either any mitigating factors which would warrant relieving the debtors of the obligation to pay or any aggravating factors showing the debtors' bad faith or lack of honesty. *Id.* This same approach was later adopted by the bankruptcy court in *In re Heffernan,* 242 B.R. 812, 816 (Bankr.D.Conn.1999) which noted the Second Circuit's recognition of the analysis as a mainstream approach.

 In evaluating a debtor's ability to repay his or her indebtedness, a court considers "the 'disposable income' that would be available to pay creditors under a hypothetical Chapter 13 plan" *Heffernan,* 242 B.R. at 816, *citing, In re Koch,* 109 F.3d 1285, 1288 (8th Cir.1997). *See also Lamanna,* 153 F.3d at 4 n. 7, 5 (finding that a debtor's ability to fund a Chapter 13 plan out of future disposable income is the primary, but not conclusive, factor in determining whether granting relief is a substantial abuse). The definition of disposable income under a Chapter 13 consumer debtor plan is income received by the debtor not reasonably necessary (1) to be expended for the maintenance and support of the debtor, or a dependent of the debtor, or (2) to be expended for certain allowed charitable contributions. 11 U.S.C. § 1325(b)(2). While income that is reasonably necessary to support dependents is excluded from disposable income, amounts voluntarily paid to non-dependent family members are included in the disposable income calculation. *In re Richmond,* 144 B.R. 539, 542 (Bankr.W.D.Okla.1992). This is because although one may feel morally compelled to provide support for non-dependent family members, it is not a legal obligation, while there is a legal obligation to creditors. *In re Mastromarino,* 197 B.R. 171, 178 (Bankr.Me.1996). A debtor cannot "unilaterally ... subordinate his creditors" to those he chooses to subsidize. *Id.* Even if considered "commendable" to voluntarily support such non-

dependent family members, it cannot be at the expense of creditors. *United States Trustee v. Duncan (In re Duncan)*, 201 B.R. 889, 897 (Bankr.W.D.Pa.1996). Finally, relevant to assessing the totality of circumstances, the court considers factual arguments justifying expenses. *Kornfield*, 164 F.3d at 782.

After a court has analyzed the disposable income and ability to pay, it then considers additional factors, some of which are mitigating factors that militate against dismissal, others are aggravating factors emphasizing a debtor's bad faith, dishonesty or lack of need for a discharge. *Carlton*, 211 B.R. at 478. The bankruptcy court evaluating the Kornfield debtors' petition noted that it would consider any relevant factors to that determination and listed 15 illustrative factors:

(1) whether petition was filed because of sudden illness, calamity, disability, or unemployment;

(2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay;

(3) whether the petition was filed in good faith;

(4) whether the debtor showed good faith and candor in filing schedules and other documents;

(5) whether the debtor has engaged in "eve of bankruptcy purchases;"

(6) whether unforseen or catastrophic events forced the debtor into chapter 7;

(7) whether debtor's disposable income permits liquidation of consumer debts with relative ease;

(8) whether the debtor enjoys a stable source of future income;

(9) whether the debtor is eligible for adjustment of his debts through chapter 13;

(10) whether there are state remedies with the potential to ease the debtor's financial predicament;

(11) whether there is relief obtainable through private negotiation, and to what degree;

(12) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities;

(13) whether the debtor has significant retirement funds;

(14) whether the debtor is eligible for relief under chapter 11 of the Bankruptcy Code; and

(15) whether there is no other choice available to the debtor for working out his financial problems other than chapter 7, and whether the debtor has explored or attempted other alternatives.

*Id.* With respect to the existence and size of pension plans and retirement funds, these factors are considered by the Court because they impact on the debtor's current need to set funds aside for the future and are, therefore, relevant to a debtor's financial planning. *Kornfield*, 164 F.3d at 784. Inasmuch as the totality of circumstances test is equitable, even exempt assets such as retirement funds or pension plans are relevant to a consideration of a debtor's ability to repay its debts. *Id.*

### Procedural History

The Debtor, a Lebanese citizen who resides in New York and is employed as a translator/revisor by the United Nations, filed her chapter 7 petition on April 6, 1999.

On September 13, 1999, the United States Trustee filed a motion seeking dismissal of the chapter 7 case for substantial abuse, pursuant to 11 U.S.C. § 707(b), or, in the alternative, dismissal for cause pursuant to 11 U.S.C. § 707(a) (the "Dismissal Motion"). On October 15, 1999, the Debtor filed an objection to the Dismissal Motion.

The Court conducted a two-day evidentiary hearing on the Dismissal Motion which hearing commenced on October 20, 1999 and continued on November 15, 1999. During the course of the hearing, the Court ruled that the Chapter 7 trustee and

creditors could participate in the hearing or file pleadings concerning the Dismissal Motion. On November 12, 1999, United Nations Federal Credit Union ("UN-FCU"), a creditor, filed an application in support of the Dismissal Motion. UNFCU and another creditor, American Express Travel Related Services Company, Inc. ("AmEx"), participated in the hearing.

Based upon the pleadings filed and the evidence adduced at the hearing and viewing the totality of the circumstances as approved by the Second Circuit in *Kornfield*, 164 F.3d at 783–84, the Court finds that dismissal of the Debtor's chapter 7 petition is warranted pursuant to 11 U.S.C. § 707(b) as constituting a substantial abuse of chapter 7 of the Bankruptcy Code.[2] The Debtor did not dispute the United States Trustee's contention that her debt is primarily consumer debt and, based upon the testimony, the Court finds that the debt was incurred by the Debtor primarily for personal, family, or household purposes. Similar to the court in *Heffernan*, 242 B.R. at 816, this Court applies the analysis utilized by the bankruptcy court that considered the Kornfield debtors' petition, *see Carlton*, 211 B.R. at 477–78, and which was accepted by the Second Circuit. *Kornfield*, 164 F.3d at 783. This Court will first consider the Debtor's ability to pay which analysis, in itself, considers the Debtor's personal circumstances. Then the Court will then consider other mitigating or aggravating factors.

The Debtor argues that it is inappropriate to focus on the disposable income available to a debtor to pay in the future because that is a Chapter 13 analysis and a debtor cannot be required to file a chapter 13 plan. The Debtor maintains that in considering substantial abuse, the court may only consider a debtor's motivation for filing a petition on the date of the filing.

The Debtor acknowledges that she was an imprudent spender but maintains that she had a problem with spending and had no intent to defraud creditors. Rather, on the date of filing the petition, she contends that she filed because her unsecured debts were in excess of $102,000 and she could not meet her then current obligations totaling over $16,000, inasmuch as she only had $1,000 available. Further, she argues that because she had no non-exempt assets to protect under a chapter 13 plan, she viewed her only options as filing a bankruptcy petition under chapter 7 or defaulting and allowing her creditors to use other remedies.

Although a debtor cannot be compelled to file a chapter 13 petition,[3] the majority of courts consider a debtor's ability to repay debts out of future income in determining whether there is substantial abuse. Indeed, the trend has been to consider that factor with the only difference in analysis being the "degree of emphasis to be placed" on that factor. *Kornfield*, 164 F.3d at 781. Some courts find the factor dispositive, others consider it but one of many factors. (*See* cases cited in *Kornfield*, 164 F.3d at 781.) In the chapter 13 analysis, a court considers the disposable income which is reasonably necessary to the maintenance and support of the debtor and his dependents. That analysis entails considering a debtor's personal circumstances as required by *Kornfield*, 164 F.3d at 781 (noting that even where ability to pay is considered the dispositive factor, the debtor's personal circumstances are relevant). Thus, it is appropriate to consider the "disposable income" that would be available to pay creditors under a hypothetical chapter 13 plan.

---

**2.** Inasmuch as the Court has determined that the petition should be dismissed pursuant to 11 U.S.C. § 707(b), it does not address the United States Trustee's alternate request to dismiss the chapter 7 petition pursuant to 11 U.S.C. § 707(a).

**3.** 11 U.S.C. § 303(a) provides in pertinent part that "[a]n involuntary case may be commenced only under chapter 7 or 11."

*Application of the Law to the
Facts of this Case*

The Debtor's Statement of Financial Affairs lists her 1998 gross income as $104,000. The Debtor's 1997 gross income is listed as $97,000. The Debtor testified that the increase was the result of a salary step increase to which she is entitled each year.

The Debtor's summary of schedules indicates that her assets consist of personal property with a total value of $102,884. The largest component is her pension plan fund which is listed as valued at $96,524. The amount the Debtor owes to unsecured creditors with non priority claims is $102,613.[4] Schedule F lists these creditors and the amounts owed them as follows:

| | |
|---|---|
| AmEx | $12,362 |
| Chase Manhattan Bank | 9,746 |
| Citicorp Diner's Club | 2,063 |
| Macy's | 485 |
| UNFCU Visa | 11,186 |
| UNFCU | 66,771 |

Schedule I lists the Debtor's gross monthly income as $8,707 and her net monthly income is $5,709. In Schedule J, the Debtor listed her estimated average monthly expenses as $5,100. Schedule J includes a description of the expenses incurred and their amounts as follows:

| | |
|---|---|
| rent | $2,070 |
| telephone | 175 |
| cable TV | 60 |
| home maintenance | 220 |
| food | 750 |
| clothing | 110 |
| laundry & dry cleaning | 90 |
| medical & dental | 325 |
| transportation | 190 |
| recreation & entertainment | 100 |
| charity | 10 |
| support for her mother | 1,000 |

The difference between the Debtor's net monthly income of $5,709 and her estimated expenditures of $5,100 is $609. This $609 would be available to pay creditors. Moreover, the Debtor acknowledged that some of the listed expenses could be reduced further. Indeed, in considering whether the expenses listed on the Debtor's schedule are reasonably necessary for her support and maintenance, the Court finds that certain expenses are either unnecessary or the amount claimed is excessive for that purpose.

The Debtor testified that the $220 monthly charge listed for home maintenance reflects the $55 per week that she pays a person to clean her home. When questioned as to whether she had done any cleaning herself, the Debtor responded that she did not have "patience for that" and that she "didn't study all those years [to] clean the house." While the Debtor may desire the benefit of hiring someone to do the cleaning, she cannot fund such at the expense of her creditors. The fact that the Debtor is highly educated does not mean that her creditors should bear the burden of her distaste for undertaking menial tasks. Eliminating this expense adds $220 to the disposable income estimation.

The Debtor scheduled $750 per month for food. She testified that she eats out because she does not know how to cook. The Debtor's testimony indicates that she eats her breakfast at home and has cheeses, fruit, milk, etc. in the house but eats all other meals out. Although it would seem reasonable for a working person in midtown Manhattan to routinely purchase lunches in the surrounding area during the week, it is not reasonable under the facts presented here to believe that the luxury and convenience of eating dinner out on a daily basis is an expense that should be borne by her creditors. If the Court assumes that the items purchased to prepare breakfast and to have snacks in the apartment cost the Debtor $75 per month, and that lunches at $7 a day for from 20–22 workdays is approximately $150, the Debtor could easily budget her dinners and non workday lunches for $375 per month, thereby expending $600 a

---

4. Although Schedule F indicates the unsecured creditor non priority claims total $104,676, the Debtor acknowledged that one claim listed was a duplicate entry.

month on food.[5] As a result of reducing the $750 budgeted for food to $600, $150 is added to the disposable income estimate.[6]

■ When questioned as to the monthly medical and dental expense of $325 per month, the Debtor testified that the expense represents the amount she expends on what she termed "dermatology-related" procedures. The description of the services revealed that they were cosmetic in nature. While the Debtor has medical insurance and pays a $10 co-payment when the procedure involved is covered by her insurance, procedures that are cosmetic in nature are not covered. The Court finds that based upon the Debtor's description of the procedure and the fact that the procedure is not covered by her insurance indicate that it is an elective cosmetic procedure and is not a reasonably necessary expense for her support and maintenance. Although the Debtor did not allocate any of the $325 payment to her co-payment for covered procedures, the Court will allow the Debtor an expense of $50, a portion of which may be potentially used for medical co-payments as required and the balance can be applied for miscellaneous purchases of over-the-counter products that can address her dermatological concerns. Thus, $275 can be added to the disposable income calculation.

■ The Debtor's telephone bill is scheduled at $175 per month. She testified that it is high because she has to telephone family in Lebanon. She further testified that she recently switched to using long distance calling cards which are less expensive but has found the connection not to be very good, therefore, she is considering switching back to the regular phone service. Although the Court's initial reaction was that this amount was excessive, the Court is not persuaded under the Debtor's particular circumstances, where close family relations are either in Lebanon or Boston, Massachusetts, that $175 is not reasonable and therefore does not adjust this amount.

■ The debtor listed $190 as her monthly transportation expense. She testified that this cost results from her having to take taxicabs to and from work. However, the Debtor's apartment is less than one mile away from her workplace; indeed, the Debtor pays a premium rent to live near her place of work. The Debtor testified that she has to be at work at 9:30 a.m. When questioned about using public transportation, the Debtor said she tried taking a bus but it took too long. The Court is well aware that ordinarily taxi cabs are a faster mode of transportation than buses, but another solution is leaving for work earlier, not continuing to live above ones' means. Therefore, on most days she could use public transportation and arrive at work on time. The round trip fare for public transportation would be $3 per work day. However, the Debtor testified that she often works nights. Recognizing that on certain occasions,

---

5. Viewed from another perspective, the total of $600 per month budgeted for food allows the Debtor $150 per week.

6. The Court reviewed the U.S. Dept. of Labor, Bureau of Labor Statistics, *Consumer Expenditure Survey, 1997–98, Table 31, Northeastern region by income before taxes: Average annual expenditures and characteristics*. According to this survey, a family comprised of two adults and one child in the region with a gross income of $113,361 expends an average of $750 per month on food. The Court recognizes the limitations of this survey because it is based upon an average and not specifically adjusted for midtown Manhattan. Neverthe-

less, the Court notes that considering this statistic, it would seem that $600 would be ample to feed a family of one even in the midtown Manhattan area. Further, the Court made a random sampling of chapter 13 filings by single debtors residing in Manhattan. In none of the cases did a debtor list an estimated monthly food expenditure exceeding $400. Even considering that the Debtor may live and work in a more expensive part of Manhattan than reflected in the Court's random survey, a $600 allowance for food appears more than reasonable. Moreover, during examination, the Debtor begrudgingly admitted that her food expense could be reduced to the lesser amount of $500 per month.

when the Debtor works late into the night or if there is inclement weather, the Debtor might find it necessary to take a taxicab, the Court will allow $100 for transportation. This adds $90 to the disposable income.

■ The Debtor listed $60 on her schedule for cable television. This includes her option to enjoy the luxury of some premium channels. The Debtor could maintain standard cable service for approximately $35 per month. The Debtor testified that she was considering less expensive alternatives for the same type of cable options to reduce her monthly charges. Therefore, the Debtor could reduce this expenditure to $35 per month adding $25 to the disposable income estimate.

■ Finally, as previously discussed, courts that have considered substantial abuse dismissal motions include voluntary support payments to non-dependents in the disposable income category because the moral obligation to a family member who is not a dependent does not take priority over the legal obligation to repay a creditor. Thus, because the Debtor's mother is not a dependent, amounts voluntarily contributed to her support are included in the disposable income calculation.[7] *Richmond*, 144 B.R. at 542. Thus, $1,000 is added to the disposable income calculation.

Thus, the total disposable income increases to $2,369 per month comprised of the following:

$609 — as previously listed on the Debtor's schedule
220 — home maintenance reduction
25 — cable television
150 — food reduction
275 — medical & dental expense reduction
90 — transportation reduction
1,000 — support reduction

The total disposable income of $2,369 would provide $85,284 to pay creditors in a three-year plan affording them over 83% of the amounts owed them. Based on

these monthly expenditures, the Debtor could fund a five-year plan and pay 100% of the amounts owed creditors and still have excess funds to devote, at her discretion, to some of the expenses reduced by the Court.

Having evaluated the Debtor's personal circumstances and determined that she has the ability to pay her creditors in full or a substantial amount owed them, the Court next considers the additional factors relevant to an analysis of the totality of the circumstances that may impact on whether or not a discharge is proper.

■ The Debtor acknowledges that she did not file her bankruptcy petition as a result of mounting debt due to illness, calamity, disability, unemployment, or any other catastrophic event. Rather, the Debtor admits that her mounting debt was due to what she labels a "problem" in that she was "not in control of spending." In January 1998, the Debtor obtained a $72,-000 consolidation loan from UNFCU. Of this amount, $56,588.16 was paid to UNFCU representing the balance due it on a previous consolidation loan she had received, in addition to approximately $24.816 owed to them for charges on her UNFCU Visa credit card account. With respect to the balance of the loan, $10,-350.56 was used to pay amounts due on other credit cards and her Chase line of credit and $5,061 was given to her in cash. After obtaining this consolidation loan, the Debtor had a zero credit card balance. In conjunction, with the receipt of the consolidation loan, the Debtor signed an agreement concerning certain of the credit card accounts and the Chase line of credit and agreed "not to re-open or use these accounts any time in the future, without the written consent of [UNFCU]." However, from January 1998 to April 1999, the Debtor did use certain of these accounts and incurred a debt to AmEx of approximately $12,362, and to Macy's of $485, and in-

---

7. Further, as discussed subsequently, the Court questions the Debtor's' credibility re-

garding this listed expense.

curred a total overdraft on her Chase account in the amount of $9,700. When questioned about her failure to live up to the obligation under the loan agreement to not re-open or use the credit, the Debtor stated that she tried but because they never closed the accounts, she eventually used them. In addition, in that period the Debtor incurred a debt to UNFCU Visa in the amount of $11,186 and to Diner's Club in the amount of $2,063. The testimony shows that most of the debts incurred by the Debtor were for luxury items, including expensive clothing, restaurants, expensive gifts, and beautification treatments. When questioned as to whether she lived above her means, the Debtor testified "It's obvious." However, living in excess of one's means or an extravagant lifestyle is not a justification to excuse one from the obligation to pay debts where there is an ability to pay. The Debtor cannot seek to transfer the cost of a lifestyle, far in excess of her economic means, to her creditors when she clearly has an ability to pay all such debt back within a reasonable period of time without doing anything more than adjusting her spending to live within reasonable bounds.

The Debtor also acknowledges that she incurred cash advances and consumer purchases in excess of her ability to maintain a current payment schedule according to the terms of her credit agreements.

The Court next addresses the Debtor's good faith and candor in filing her schedules and statements. Based upon the Debtor's testimony, the Court is skeptical of certain of the entries in her schedules. First, Schedule C includes an exemption for a gold wedding ring listed as valued at $200. Yet during her testimony, the Debtor acknowledged that she is not married and does not have a wedding ring. The

Debtor testified that the erroneous entry was the result of an assumption made by her attorney based on his observation of the gold band ring on her finger. However, the attorney must have inquired as to the Debtor's marital status because Schedule I indicates that the Debtor is unmarried, and in order to calculate the $200 asserted value, inquiries concerning the ring must have taken place. Thus, the explanation that the listing of the wedding band as an exempt asset was based upon the attorney's observation is not credible.[8]

Of more concern to the Court is the Debtor's testimony with respect to the entry on Schedule J of $1,000 in monthly support allegedly provided to her mother. Viewed as a whole, the Debtor's testimony concerning such payments is not credible. The Debtor acknowledged that her mother is not a legal dependent but testified that she is obligated to support her because the Debtor's siblings are currently unable to do so. The Debtor further testified that although she has two educated siblings, one a neurologist and the other involved in the computer field, both have been only intermittently employed in the recent past. However, the Debtor also testified that one of her brothers gives the Debtor some support by allowing her to charge on his AmEx credit card. This is a privilege the Debtor claims not to abuse, maintaining that she does not usually charge more than $200 in any given month. The fact that she is able to utilize her brother as a source of income, however small the amount, seems to contradict the Debtor's testimony that this brother is intermittently employed and unable to help support their mother.

The Debtor further testified that she has no information on her mother's specific monetary needs because she does not feel

8. When responding to the Court's inquiry concerning the scheduled reference to the wedding ring, the Debtor indicated that she had previously provided an explanation for that entry. Inasmuch as the Court has not located any such prior explanation in the record of the hearing, the Debtor must have been referring to an exchange with the United States Trustee's office at some time prior to October 15, 1999, the first day of the Court's hearing. Therefore, the Debtor has been aware of the error for some time, however, the Court's records do not reflect that any action was taken to correct the schedules.

that her mother should have to account to her. However, the Debtor testified that the average amount she sends is $1,000 in cash per month, with the actual amount ranging from $900 to $1,200 in any particular month. The Debtor contends that at one time she would wire transfer the funds but because this method was too costly, she subsequently decided to have the cash delivered by hand with friends when they traveled to Lebanon. However, the Debtor's bank account statements show only small withdrawals, primarily in amounts of $100 and $200.[9] When questioned as to the absence of a large cash withdrawal, the Debtor testified that she was afraid of losing a large amount of money. Therefore, she claims to have made $200 withdrawals, spending part and putting $100 aside towards the future support payment that she ultimately would have delivered to her mother in a lump sum when a friend traveled to Lebanon. Thus, the Debtor's testimony is that she does not withdraw a large amount of cash for fear of losing it but prefers to withdraw it over time, storing it in her apartment and then turning it over in quantities of $1,000 to another who will carry it to the airport and on to Lebanon. However, this explanation is not credible. For someone who spends money the way the Debtor does, it is not plausible that she would accumulate this money in her apartment over time then give it to someone to transport and deliver it in Lebanon to her mother merely to avoid paying the $30 wire transfer charge. Moreover, the ready availability of cash in her apartment would seem to present an significant temptation for one with a spending problem.

The most inconsistent aspect of the Debtor's testimony with respect to the small succession of withdrawals is that,

when coupled with her other testimony concerning her monthly expenses, it does not appear that, in total, there was enough money withdrawn to pay the cash expenditures she alleges and still have funds to set aside. The Debtor's cash outlays each month include $220 to the person who cleans her apartment and $190 for taxicabs to and from work. In addition, a portion of her monthly food expense is paid in cash. Thus, if the Court is to credit the Debtor's testimony as to the sums she has expended on these items, then it must discredit the Debtor's testimony on the support payment to her mother. In addition, the Court reviewed the Debtor's bank statements for the months of March through July 1999 and the only months in which she withdrew a total of more than $1,000 were May and June, the months her mother was visiting in New York. Thus, it seems possible that during the two months her mother was in New York, the Debtor may have given her money. However, in the other months, the withdrawals did not even total $1,000, and when you factor in the amounts she testified that she spends on various cash paid items, there is very little, if any, balance available for the support payment. Therefore, the evidence does not comport with the claimed method of making this alleged support payment.

In addition to the evidence not being consistent with support payments to her mother in cash, review of the Debtor's testimony as to her previous and current expenditures on luxury items, makes in equally clear that the Debtor could not have funded these payments in any form. The level of her historical and current expenditures, as testified, would indicate that she never had $1,000 available.[10] Rather, it appears that when attempting to set up an estimated monthly expense

---

**9.** In June 1999, there were two larger withdrawals, one for $500 and the other for $300.

**10.** The Debtor testified that she continues to undergo various beautification treatments on a regular bases whose costs exceed, on average, $600 per month. She also asserted that she maintains her expensive taste for clothing and has continued to make such purchases post-petition. An examination of her bank statements reflects regular debit purchases that routinely leave little or no balance in her account at the end of the month.

schedule, the Debtor sought to reduce her potential available disposable income by including this payment inasmuch as it would be a more "acceptable expenditure" than the luxury items that she has testified to purchasing. As previously discussed, support payments to non-dependents are included in disposable income. The Court does not have to address the issue of whether there are instances under which such support might constitute an extenuating circumstance because under the facts of this case, it clearly does not.

In considering the issue of the Debtor's trustworthiness, the Court cannot ignore the fact that when she entered into the January 1998 consolidation agreement with UNFCU, she signed an agreement requiring that she not incur further debt on her credit cards and line of credit. Nevertheless, she testified that although letters were sent to close such accounts, when she subsequently discovered that the accounts had not been closed, she proceeded to incur credit on those accounts again despite her agreement to the contrary.[11]

With respect to other alternatives available to the Debtor, the Court has already established that the Debtor, if she voluntarily chose, could file and fund a five-year 100% chapter 13 plan, or at least a three-year plan with a substantial payment to creditors. The analysis shows that the Debtor's disposable income would permit liquidation of her consumer debts with relative ease taking into consideration the Debtor's stable source of future income and her ability to reduced her expenses without adverse impact on her need for adequate food, clothing, shelter, and other necessities.

Further, the Debtor has other assets to consider. In Schedule C, the Debtor valued her pension arrangement for an exemption at $96,524.[12] While these funds may be exempt from creditors, the Court can nevertheless consider that source when evaluating the Debtor's overall circumstances. In addition, the Debtor has testified that if she were to separate from service at the United Nations, she would be entitled to indemnities and repatriation grants totaling over $90.000. At such time, this entitlement of over $90,000 would be subject to recoupment by UNFCU. Indeed, UNFCU limited the amount that they lent her based upon projections of the amount she would be entitled to upon separation from service.

Moreover, the same considerations applied to the chapter 13 analysis would apply when considering state remedies with the potential to ease the Debtor's financial predicament. Pursuant to New York State law, the Debtor could allow her creditors to garnish her wages, which in New York would not exceed 10% of her gross annual income absent a finding by the state court judge that the Debtor could afford to pay more. *See Carlton,* 211 B.R. at 482. The Debtor would have access to the balance of her substantial salary and, with the reduction in her expenses, not suffer from deprivation of adequate food, clothing, shelter, or other necessities. Thus, there are manageable alternatives available to the Debtor to work out her financial problems other than relief through chapter 7.

The Court finds that the Debtor's substantial debts were a result of her excessive spending which she declined to modify when confronted with mounting debt. She was unwilling to adjust her extravagant

11. The following exchange took place on the record:

Q Did you use your American Express, your Chase and your Macy's cards after you signed this promise not to—
A I did not use it right after, no. I did not need to.
Q Did you use it afterwards?

A Way afterwards, yes, when I found out they were still working.

12. However, exhibit C which is entitled "United Nations Joint Staff Pension Fund Annual Statement as at 31 December 1998" lists the withdrawal settlement to which she would be entitled if separated on December 31, 1998 at $118,759.

spending to conform to her income but, rather, chose to allow her creditors to fund that lifestyle. Many of the debts, including extravagant presents allegedly given to friends when she was not paying her current debts, could have been avoided. The Debtor has substantial future income and viewing her personal circumstances, has the ability to repay her creditors all or, at least, a substantial portion of the debt owed them. The Debtor can elect to proceed in chapter 13 or seek other state remedies or private negotiations to manage her payment obligations. Moreover, there are no mitigating factors that would warrant relieving the Debtor of her financial obligations. The same observation made by the Second Circuit in *Kornfield* applies in this case, "[t]his is the paradigm of the case that Section 707(b) was designed for: debtors enjoying a substantial income but seeking to transfer the cost of an unnecessarily extravagant lifestyle to creditors." *Kornfield,* 164 F.3d at 784.

### CONCLUSION

Having considered the Debtor's personal circumstances, the Court finds that she has the ability to pay her creditors. In addition, in considering other elements of the totality of circumstances analysis, there are no mitigating factors that would warrant relieving the Debtor of her obligations and there are a number of aggravating factors. Based on the totality of circumstances, affording the Debtor a chapter 7 discharge would be inequitable to her creditors and a substantial abuse of the provisions of chapter 7 of the Bankruptcy Code. Therefore, the Debtor's chapter 7 petition should be dismissed.

The United States Trustee is to settle an order consistent with this Memorandum Decision.