**In re Michael VANSICKEL and Lorelei Vansickel, Debtors.**

**No. 03–14123–RGM.**

United States Bankruptcy Court, E.D. Virginia, Alexandria Division.

April 7, 2004.

Robert A. Nicoli, Dain, Oxley, Markley & Nicoli, P.L.L.C., Reston, VA, for Debtors.

Dennis J. Early, Office of the U.S. Trustee, Alexandria, VA, for U.S. Trustee.

## MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

THIS CASE is before the court on the United States Trustee's motion to dismiss for substantial abuse under § 707(b) of the Bankruptcy Code. For the reasons stated below, the motion will be denied.

### Background

Michael and Lorelei Vansickel filed a joint petition in bankruptcy pursuant to chapter 7 of the United States Bankruptcy Code in this court on September 4, 2003. They listed $57,591 in debts: a $21,000 secured car loan;[1] two priority tax claims totaling $8,369; eight credit cards totaling $12,858;[2] an unsecured automobile deficiency claim in the amount of $7,868 arising from a voluntary surrender of an automobile; and two other debts totaling

---

1. The debt is scheduled as undersecured. The secured portion was listed at $20,000; the unsecured portion at $1,000.

2. Three collection agencies are listed for notice purposes only. One represents Wells Fargo which has a claim, apparently arising from a credit card, of $7,449. The second represents Capital One which has two claims, one against Mr. Vansickel and the other against Mrs. Vansickel, both apparently arising from credit cards, for $804 and $1,394, respectively. The third represents Toyota, the unsecured automobile lender, which has a deficiency claim of $7,868. Question 4a states that Capital One filed a suit against Mr. Vansickel. No other suits are reported.

$7,496. They rent a townhouse. Their personal property, all of which is exempt, is scheduled with a value of $28,120.[3]

Schedule I, "Current Income of Individual Debtors," states that Mr. Vansickel is employed by the federal government as a management analyst. He has been employed there for 13 years. He also held a second job which he recently quit. His gross monthly income totaled $9,032.00, $8,132.00 from the government job and $900.00 from the second job.[4] His net monthly income was listed as $5,287.00. Mrs. Vansickel is not employed although the debtors' 2001 federal tax return shows that she earned $2,711.39 and their 2002 federal tax return shows that she earned $2,591.05. They have two children, their 13-year-old son and her 26-year-old daughter. Their total monthly expenses were listed at $5,285.00. Schedule J, "Current Expenses of Individual Debtors."[5] There was no testimony as to the debtors' health.[6]

### United States Trustee's Position

The United States Trustee's case at the hearing closely followed his motion to dismiss. His principal argument was that "the implementation of a more reasonable budget would provide the debtor with sufficient disposable income to fund a Chapter 13 plan that would pay a substantial portion of the unsecured debt over a three to five year period." Motion to Dismiss, ¶ 8. (Docket Entry 9).

The United States Trustee addressed each of the six factors set out in *Green v. Staples (In re Green)*, 934 F.2d 568, 572 (4th Cir.1991). He argued that the debtors had the ability to repay their debts. The original Schedules I and J reflect almost no net disposable income, however, a "more reasonable budget would provide the debtor with sufficient monthly disposable income to pay a significant portion of his debts." Motion at 5. On the income side, he argued that Mr. Vansickels' voluntary repayments of Thrift Savings Program ("TSP") loans and continued voluntary TSP contributions, totaling almost $800 a month, should be discontinued. Motion at 5. On the expense side, he argued that several monthly expenses were too high: rent, car payment, support for dependents, home maintenance and recreation. Motion at 6. At the hearing, he concluded that with these adjustments the debtors could make a 100% distribution to unsecured creditors in a chapter 13 plan.

The United States Trustee also argued that there was no sudden illness, calamity, disability or unemployment; that in light of the TSP loan payments and excessive expenses the debtors' schedules and statement of current income and expenses did not accurately reflect their true financial condition; and that the "debtors voluntarily incurred consumer debts beyond their ability to pay them." Motion at 5–7. He acknowledged that the case was not commenced in bad faith. Motion at 7.

---

3. They list cash ($20.00), checking account ($100.00), household goods ($5,000.00), clothing ($2,000.00), Mr. Vansickel's retirement account ($1,000.00) and a 2003 Ford Taurus ($20,000.00).

4. The $900.00 is his net take-home pay.

5. The Vansickels filed updated Schedules I and J on February 12, 2004. The net disposable income dropped from $2.00 a month to a net deficiency of $1,118.00 per month. The change resulted from a drop in income from Mr. Vansickel quitting the second job and adding an income tax installment payment to satisfy the priority tax claims.

6. The debtors' response referred to "Mrs. Vansickel's own disability" and her "continuing unemployment." There was no testimony as to these issues and they cannot be considered.

### Debtors' Position

Mr. and Mrs. Vansickel contended that their budget was reasonable and should not be adjusted. They used the same analytical framework as the United States Trustee but reached the opposite conclusion.

### Discussion

### Legal Standard: Green v. Staples (In re Green)

Section 707(b) provides that:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

█ Congress did not define the term "substantial abuse" and left articulation of more particular parameters to the courts. The Court of Appeals for the Fourth Circuit noted that a precise definition is difficult to agree upon. *Green*, 934 F.2d at 571. The definition must reconcile "the tension between the fundamental policy concern of the Bankruptcy Code, granting the debtor an opportunity for a fresh start, and the interest of creditors in stemming abuse of consumer credit." *Id.* It continued,

"The ambiguity of the statutory language is no doubt a reflection of Congress's inability to agree on a definition of substantial abuse which would encompass these countervailing considerations in all situations." *Id.* Indeed, the courts have not been able to agree on a single

definition. The two principal competing tests are the ability to pay and the totality of the circumstances. *In re Stewart*, 175 F.3d 796 (10th Cir.1999)(ability to pay should be the primary factor in totality of circumstances, but is not a necessary element); *In re Kornfield*, 164 F.3d 778 (2nd Cir.1999)(totality of the circumstances); *In re Lamanna*, 153 F.3d 1 (1st Cir.1998) (totality of the circumstances); *In re Green*, 934 F.2d 568 (4th Cir.1991)(totality of the circumstances); *In re Krohn*, 886 F.2d 123 (6th Cir.1989)(ability to pay or dishonesty); *In re Koch*, 109 F.3d 1285 (8th Cir.1997)(ability to pay); *In re Walton*, 866 F.2d 981 (8th Cir.1989)(ability to pay); *In re Kelly*, 841 F.2d 908 (9th Cir.1988)(ability to pay).

█ The Fourth Circuit adopted the totality of the circumstances test in *Green*. This test "allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." *Green*, 934 F.2d at 572. It preferred the totality of the circumstances test over an ability to pay test "because it better accords with what is known of Congressional thinking surrounding the adoption of Section 707(b)," is consistent with the statutory presumption in favor of granting the relief requested by the debtor, and allows a case-by-case analysis. *Id.* at 572.

█ The Fourth Circuit rejected the ability to pay test for a number of reasons. The ability to pay test finds substantial abuse when the debtor has the ability to pay his creditors. No other factors are considered. This test implies a mandatory chapter 13 scheme. However, Section 707(b) makes no reference to chapter 13 and does not permit the court to convert

the case to chapter 13.[7] Chapter 13 relief remains voluntary. 11 U.S.C. § 1307(b). "Congress considered and rejected the use of a threshold future income or ability to repay test (known as 'mandatory chapter 13') as a qualification for chapter 7 relief for consumer debtors." *Green*, 934 F.2d at 571. There are practical problems with the application of such a test. It implies that a hypothetical chapter 13 plan will be completed successfully. In fact, successful completion of a particular chapter 13 plan is difficult to predict. While feasability is a confirmation requirement, 75% of the chapter 13 petitioners in this division fail to obtain a chapter 13 discharge.[8] The totality of the circumstances test is better suited than the ability to pay test to separate honest debtors who are entitled to a fresh start from those who would abuse the bankruptcy process by seeking to take unfair advantage of their creditors. *Id.* at 572.

■■■ *Green* teaches that the presence of net disposable income sufficient to support a chapter 13 plan is not in and of itself sufficient to find substantial abuse. It is but one factor to be considered. *Green* identifies six factors to be considered in determining whether a petition should be dismissed for substantial abuse. The factors[9] enumerated are (1) whether the debtor has the ability to repay his debts; (2) whether the debtor filed his

bankruptcy petition because of sudden illness, calamity, disability, or unemployment; (3) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect his true financial condition; (4) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay; (5) whether the debtor's proposed family budget is excessive or unreasonable; and (6) whether the petition was filed in good faith. *Id.*

■■■ The factors listed in *Green* assist in determining whether a petition in a particular case is a substantial abuse of the bankruptcy system. They—and any other relevant factors—are to be weighed, not counted.[10] While some of the factors are similar and interrelated, they are not duplicative.[11] For example, Schedules I and J may reasonably and accurately reflect the actual current financial conditions of the debtor, but the budget presented may nonetheless be excessive or unreasonable. Conversely, the budget may appear reasonable, but not accurately reflect the debtors' actual circumstances. The usual first step is to determine the extent, if any, to which a debtor has the current ability to pay his creditors. This determination must be predicated on the accuracy and the reasonableness of the proposed budget. When this has been determined, the debtor's ability to pay should be manifest.

7. If a debtor is denied chapter 7 relief for substantial abuse, the sole remedy is dismissal. In many cases the debtor will voluntarily convert to chapter 13.

8. The court is not aware of any detailed analysis that differentiates chapter 13 cases that are dismissed or converted before confirmation because no plan is feasible and those that are dismissed or converted after a confirmed plan has been partially completed. It is fair to say, however, that most confirmed chapter 13 plans are unsuccessful.

9. The *Green* list is illustrative rather than exhaustive. *Green*, 934 F.2d at 572 ("The 'totality of the circumstances' approach involves an evaluation of factors *such as the following*") (emphasis added).

10. If the factors were to be counted, the ability to pay would have the same weight as any other factor. *Green* suggests that it be given greater weight than the other factors.

11. If some factors were duplicative, some matters would automatically be considered at least twice and be given undue consideration.

If there is an ability to pay, the court must then determine whether it will continue into the future. The court will first consider these factors and then consider the other *Green* factors.

### Ability to Repay Debts

**Do the debtors' schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition?**

The debtors filed their original Schedules I and J with their petition on September 4, 2003. They filed amended Schedules I and J on February 12, 2004.[12] Schedule I was amended to eliminate net income of $900.00 a month from a second job Mr. Vansickel resigned from at the end of 2003. Schedule J was amended to add a $220.00 per month tax installment payment. The original schedules reflect a monthly surplus of $2.00; the amended schedules, a monthly deficit of $1,118.00.

The expense side requires little comment with respect to accuracy. The United States Trustee did not argue that the expenses on Schedule J were inaccurate, only that they were excessive. Nor was there any evidence that they were inaccurate. The court will, therefore, accept them as accurately stating the debtors' monthly expenses, subject to the United States Trustee's argument that they could be reasonably reduced with some belt-tightening. This will be discussed in the next section, "Is the debtors' proposed family budget excessive or unreasonable?"

The income side as reflected in Schedule I, "Current Income of Individual Debtors," is troubling because the net income as stated on Schedule I from Mr. Vansickel's principal job does not coincide with his October 24, 2003 earnings statement. (Exhibit 4). The gross income is correct.[13] Both the original and amended Schedules I show gross monthly income of $8,132.00. The earnings statement computes to $8,132.80 per month.[14] It is the payroll deductions that do not add up. Both the original and the amended Schedules I show payroll taxes and social security as $3,251.00 and insurance as $494.00, for a total deduction of $3,745.00 a month. The earnings statement shows total deductions of $3,345.03. The difference is $399.97, which is about 80% of the deduction shown on Schedule I for insurance. The earnings statement shows two deductions for life insurance totaling $38.35 a month, but they are included in the total deductions of $3,345.03. There was no evidence of a separate $494.00 payroll deduction for insurance. There was no significant change

12. The fact that schedules are amended has been considered by courts in § 707(b) cases particularly where there have been multiple amendments. *See, e.g., In re Peluso,* 72 B.R. 732 (Bankr.N.D.N.Y.1987). The fact that schedules are amended may suggest that they were originally inaccurate or that the debtor manipulated them to arrive at a predetermined outcome, a good faith issue. In this case, the one amendment reflected two actual post-petition changes and does not itself suggest these concerns.

13. The court and the United States Trustee accept Mr. Vansickel's testimony that he resigned from his second job before he prepared his amended Schedule I. He testified that he took the job specifically to satisfy a past-due child support obligation which has now been satisfied. His resignation will be considered further when the debtors' good faith is discussed. The original Schedule I merely shows a net monthly income for the second job and not the gross income and the deductions from it. The United States Trustee does not challenge the accuracy of the net amount. An analysis of the debtors' W–2 statements for 2001 and 2002 substantially supports the net amount stated on the original Schedule I.

14. Mr. Vansickel is paid bi-weekly. All amounts have been adjusted to a monthly equivalence.

in Mr. Vansickel's pay or deductions throughout 2003.[15] The debtor did not satisfactorily explain this discrepancy.

The amended Schedule I contains an additional error that the court does not weigh against the debtor. The debtor, a federal government employee, received a 4.1% pay raise effective January 1, 2004, which is not reflected on the amended Schedule I filed on February 12, 2004. While the debtor knew there would be a pay raise, the final amount was not known until late January or early February 2004. It is unclear when the debtor found out about the final amount and when if first appeared in his paycheck. The debtor was forthcoming about the raise at the hearing and accurately estimated his new salary at $102,700.00 per year. The court finds that the debtors' net take-home income is presently $3,713.00.[16]

### Is the debtors' proposed family budget excessive or unreasonable?

 The United States Trustee attacks the debtors' budget on two principal grounds: first, that certain expenditures are overstated or extravagant;[17] and second, that Mr. Vansickel's net monthly income is understated because he is repaying TSP loans and making a voluntary contribution to his TSP plan. The court will first consider the United States Trustee's argument that some of the monthly expenses are excessive or unreasonable and will then address the issue of the TSP contribution and loan repayments.

### Excessive and unreasonable expenses.

The United States Trustee argues that the some of the debtors' expenditures are excessive or unreasonable. In support of his case, the United States Trustee presented the standing chapter 13 trustee as his witness. The chapter 13 trustee who was not offered as an expert witness testified that he was concerned about the expenses for telephone ($100), cable/internet ($150), home maintenance ($100), tax installment payments ($220), support for additional dependents not living at the debtors' home ($200), child's music lessons ($100) and child's orthodontist/out of pocket ($100). He did not testify that all of the budgeted items he identified would be disallowed in determining net disposable income in a chapter 13 case, only that they looked high to him and that he would need additional information. He relied on the

---

15. The earning statement reflects no change in withholding amounts during 2003 except for a change in a TSP loan repayment which is accurately stated on the earnings statement (*Cf.* Ex. 4, "Earnings Statement" and Ex. 5, "TSP Quarterly Participant Statement dated 9/30/2003") and a change in the amount withheld for federal income taxes. The amount shown for the current payroll period and the amount shown for the year-to-date divided by 22 are substantially the same for all other items. (The October 24, 2003 earnings statement was for the 22nd pay period in 2003.) The average federal tax withholding for the year was $539.13 per pay period. The amount shown on the earnings statement was $573.41. At some time during 2003, the withholding amount was increased. This leads the court to the conclusion that the discrepancy in the withholdings is not explainable as a

mistake resulting from a recent change in pay or withholdings.

16. The court took into account the net, after tax pay raise and included a $50.00 per pay period military deposit. The military deposit appears to have been completed. Box 20 on the earnings statement shows that $4,050.00, of a total due of $4,325.95, had been paid by October 24, 2003, leaving a balance of $275.95 which should have been paid by now.

17. Whether expenses are overstated or extravagant address two different factors. The first—overstatement of expenses—goes to the accuracy of the schedules. The second—extravagance—goes to the reasonableness of the budget. Both must be considered so that a fair net disposable income can be determined. The accuracy factor was discussed above.

schedules. He had not interviewed the debtors.

Mr. Vansickel testified as to the family's expenses. He testified that they have two cell phones and one land line; that the cable expense includes one or two premium features and their internet connection; that the music expense is for their son who takes lessons and attends summer music camps; and that the $200 expense for dependents is for Mrs. Vansickel's father who lives in a nursing home. He suffers from congestive heart failure. She helps him out with prescriptions and other sundry items he may need.

The chapter 13 trustee is correct that the tax installment payment would be discontinued in chapter 13 and the tax claim would be paid through the chapter 13 plan. While this adjustment to net disposable income is appropriate and will be made, the net impact is negligible. In chapter 13, the taxing authorities will be paid in full but without interest. The interest lost by the taxing authorities increases the amount available to unsecured creditors. This, in turn, is off-set by the trustee's fees and costs. The net difference in this case is insignificant.

 For purposes of § 707(b) and generally for purposes of determining disposable income under § 1325(b), the expenses listed by the debtor are generally acceptable. Most typically pass without objection in chapter 13 cases. They will be allowed here, with some modification. The court will disallow part of the premium channel expense in light of the $100 recreation expense. An expense of $100 a month for cable and internet service is reasonable. The $100 a month expense for home maintenance will be disallowed. That expense is too high for a rented townhouse. The telephone bill is not unreasonable. It is not now at all uncommon for families to have more than one cell phone and a land line. It is an increasingly ordinary and reasonable expense within the community.[18] The expense for Mrs. Vansickel's father's prescriptions will also be allowed. Mrs. Vansickel is not taking unfair advantage of her creditors by reasonably assisting her elderly father with the costs of his prescriptions.[19]

 The United States Trustee also asserted that the debtors' monthly rent of $2,300 could be reduced if they moved to more affordable housing. Mr. Vansickel testified that they live in a three-bedroom townhouse. The family consists of Mr. and Mrs. Vansickel, their 13–year old son and her 26–year old daughter. The daughter lives in the finished lower level of the townhouse. She works at an association but since she is just starting her career, is not earning much. While she helps with groceries, her income covers her car, clothes and personal expenses. She does not pay rent. The United States Trustee presented no evidence of rental rates or rental availability. The debtor testified that they wanted to stay in their son's school district; that there were few rentals available; and that they had difficulties in obtaining housing due to their

**18.** There was no evidence as to the terms of the cell phone contract or of alternative contracts that may be available. Similarly, there was no evidence as to the terms of the land line contract. The United States Trustee should show the features that the debtors pay for are excessive. Unfortunately, $100.00 a month for telephone service is no longer—standing by itself—unreasonable.

**19.** Some of these expenses may be more finely tuned in a chapter 13 case. There, the standard is the necessary support and maintenance of the debtors and their dependents. 11 U.S.C. § 1325(b)(2). Here, the standard is different. It is one of substantial abuse. 11 U.S.C. § 707(b). The difference is further discussed below.

credit situation. It is not luxury housing. In the absence of any other evidence, the court is unable to find the rent for the debtors' three-bedroom townhouse is excessive. *Cf. In re Schmonsees*, 2001 WL 1699664, *4, 2001 Bankr.LEXIS 1896, *12–13 (Bankr.M.D.N.C. Sept. 21, 2001) (Monthly mortgage payment excessive and unreasonable because it allowed debtor and his wife, without dependents, to live in a four-bedroom house in upscale neighborhood).

■ The car expense was satisfactorily explained. The lease on their old car expired during the summer of 2003. They considered purchasing a used car but found that the finance charges on a used car were higher than on a new car. They also considered that a new car would require less maintenance than a used car. The new car is a 2003 Ford Taurus. In this case, the new car was not purchased with the intent to artificially inflate their monthly expenses. It was purchased in the ordinary course of the debtors' financial affairs when the lease on their old car expired. There is no indication that they financed it for an unusually short period of time to force their monthly payments up and to make it appear that they had no disposable income. *See In re Watkins*, 216 B.R. 394, 397 (Bankr.W.D.Tex.1997). The new car expense is appropriate.

The debtors' Schedule J expenses will be set at $5,135.00 per month for purposes of calculating their available disposable income.

### Voluntary TSP contributions and loan repayments.

The first task is to determine the effect of the voluntary contribution and loan repayments on the debtors and on the debtors' ability to pay their creditors. The voluntary TSP contribution is $243.99 a month and the TSP loan repayments are $470.47 a month, (Exhibit 4) for a total of $714.46. Over 36 months, this amounts to $25,720.56. This is not the whole story. There are tax consequences if the loans are not repaid and if the voluntary contributions are terminated. If the loans are not repaid, the outstanding balance is treated as income for income tax purposes. In addition, there is an early withdrawal penalty of 10%. With respect to the TSP contribution, discontinuing it will result in income taxes on the contribution. The net benefit to creditors after taxes can be estimated and in this case would be about $12,213 over 36 months, $6,237.00 arising from the TSP loan repayments and $5,976 from the voluntary contributions.[20] There is an impact on Mr. Vansickel. He loses a matching $243.99 a month contribution from the government, a total of $8,783.64 over 36 months, and the retirement benefit from the terminated loans. The principal

20. The calculation is not straight forward. The voluntary TSP contribution will be considered first. The contribution is tax deferred, that is, no income taxes are presently paid on the contribution, although the future income will be subject to income taxation. Here, the monthly voluntary contribution is $243.99. The present tax savings is about $78.00 a month. Over 36 months, this equals a benefit to the creditors of about $5,976.

The total TSP loan repayments over 36 months at $470.47 a month is $16,936.92. Since the original contributions were tax deferred, non-payment is treated as a distribu-

tion and taxes become due. The tax is based on the principal amount of the loans, $32,194, and would be about $10,700 for federal and state income taxes and the 10% penalty for early withdrawal. (There are two TSP loans. The balances as of September 30, 2003 were $13,939.29 and $18,255.08.) The net benefit to creditors would be about $6,237. In this case, the projected TSP loan repayments would extend beyond a 36–month plan. Eliminating payments that would otherwise become due after a 36–month plan is completed does not assist the creditors.

amount of that benefit is $32,194. It can reasonably be expected to increase in value and have a greater value at retirement. The effect on Mr. Vansickel at the end of 36 months is about $49,760 less in his TSP fund than if he continued the TSP loan repayments and the TSP voluntary contribution.[21]

The second task is to determine the appropriate standard to apply. The United States Trustee argues that voluntary contributions and loan repayments must always be disallowed. The debtor argues that they should be allowed in this case. While the Fourth Circuit has adopted the totality of the circumstances standard for determining whether there is substantial abuse, it has not spoken to the extent to which voluntary retirement contributions and repayment of retirement fund loans should be considered in determining a debtor's ability to pay his creditors. Four bankruptcy courts in the Fourth Circuit have considered voluntary retirement contributions and repayment of retirement plan loans in connection with § 707(b) cases. *In re Schmonsees*, 2001 WL 1699664, 2001 Bankr.LEXIS 1896 (Bankr. M.D.N.C. Sept. 21, 2001); *In re Rodriguez*, 228 B.R. 601 (Bankr.W.D.Va.1999); *In re Norris*, 225 B.R. 329, 333 (Bankr. E.D.Va.1998); *In re Jarrell*, 189 B.R. 374, 379 (Bankr.M.D.N.C.1995).

*Rodriguez* looked unfavorably on a voluntary contribution to a 401(k) plan. *Rodriguez* presented facts different from the typical § 707(b) case. Rather than overwhelming debt, the debtor had only $4,503 in debt, of which $3,896 could be discharged in chapter 7. *Rodriguez*, 228 B.R. at 602. There is no minimum debt required to file bankruptcy and this amount may be insurmountable to some people. However, this debtor scheduled monthly gross income of $3,181.75. *Id.* He purchased a new pickup truck shortly after filing bankruptcy which increased his monthly transportation expenses by $220.50.[22] The filing was not caused by an emergency and there were questions about the accuracy of the debtor's schedules. *Id.* at 604–605. The court believed that the debtor could have repaid his creditors in full within 10 months if he had suspended his voluntary retirement contribution and delayed the purchase of the pickup truck. *Id.* at 604 n. 5. The case was dismissed for substantial abuse.

The bankruptcy court in *Norris* considered contributions to a 401(k) plan twice, first when discussing whether the debtors had incurred cash advances and consumer purchases beyond their ability to pay their obligations and then in discussing whether the debtors' proposed budget was excessive and unreasonable. *Norris*, 225 B.R. at 333. During the first discussion, the court refined its analysis to consider four elements derived from *In re Smurthwaite*, 149 B.R. 409 (Bankr.N.D.W.Va.1992).[23] It found that the debtors had incurred such expenses. Despite incurring significant

---

21. The court hesitates to use the word "cost" in describing the effect on Mr. Vansickel because the TSP fund, except for matching funds and earnings, derive from him in the first instance.

22. He reduced his original transportation expenses by $213.46 a month but took on a new truck payment of $433.96 a month for a net increase of $220.50. *Rodriguez*, 228 B.R. at 604 n. 4.

23. The elements were "(1) whether debtors voluntarily incurred consumer debt beyond their ability to pay them; (2) whether debtors engaged in a destructive financial pattern which did not appear to have an end in sight; (3) whether debtors willingly incurred additional obligations which constricted monies that could be paid to creditors, rather than limiting monthly expenses; and (4) whether debtors incurred excessive recreational expenses." *Norris*, 225 B.R. at 333.

debt, the court noted that the "debtors have utilized their 401(k) plans to create a reserve fund for future expenses, thus diverting funds that could otherwise be paid to creditors." *Id.* The court then concluded that the debtors' budget was excessive, in part, because of the 401(k) contributions.

*Jarrell* was referred to in both *Rodriguez* and *Norris* but does not discuss this issue extensively. The finding of substantial abuse rested primarily on the debtors' inaccurate schedules, particularly the understatement of their income and omission of certain debts. Mr. Jarrell contributed $129.82 as an after-tax contribution to a capital investment plan with his employer. *Jarrell,* 189 B.R. at 376. In addressing whether the debtors' proposed budget was excessive or unreasonable, the court stated, without elaboration, that the deduction "may be excessive or unreasonable in light of the Debtors' financial circumstances." *Id.* at 379.

The most recent Fourth Circuit bankruptcy case to consider the issue is *In re Schmonsees.* The defining element of *Schmonsees* is the manner in which the debtor was able to create exempt wealth while incurring consumer debt far in excess of his ability to pay it. Mr. and Mrs. Schmonsees purchased an "expensive home" several years before Mr. Schmonsees filed bankruptcy. *Schmonsees,* 2001 WL 1699664 at *3, 2001 Bankr.LEXIS at *8. The purchase "locked the Debtor into an unreasonably high housing expense." *Id.* The purchase required a first and second mortgage. After the purchase, the

Schmonsees borrowed extensively to make ends meet. They essentially "had to borrow from Peter to pay Paul." *Id.* at *3, 2001 Bankr.LEXIS at *9. Only Mr. Schmonsees filed bankruptcy. Their home was exempt from their individual creditors, most of whom were apparently the husband's, because the house was owned by the debtor and his non-filing spouse as tenants by the entireties.[24] At filing, the house had about $100,000 in equity; their unsecured debt was $133,910. *Id.* at *1, *3, 2001 Bankr.LEXIS at *2, *8. To make matters worse, the debtor borrowed $77,000 twenty months before filing bankruptcy and used $20,000 of the proceeds to pay down the purchase money second mortgage on the house. *Id.* at *6, 2001 Bankr.LEXIS at *18. The new loan was unsecured. In essence, he sought to discharge the very debts that had enabled his family to purchase their expensive home, to maintain their life-style and to accumulate their exempt wealth.

Not only did the debtor seek to retain his exempt wealth while discharging the debt that allowed him to create that wealth, he also sought to create more exempt wealth at the expense of his creditors by diverting significant income that could have been used to pay his creditors to his exempt retirement plan. The debtor had a federal retirement plan that was being funded with a mandatory contribution of 7% of his gross income. He also budgeted a $280.00 per month voluntary 401(k) contribution and a $450.00 per month 401(k) loan payment,[25] both in addition to the 7% deduction for the debtor's federal retire-

---

**24.** The trustee objected to the debtor's claim of exemption because there was joint debt and the tenants by the entirety property could be administered for the benefit of joint creditors. *See Sumy v. Schlossberg,* 777 F.2d 921 (4th Cir.1985). The debtor paid the joint creditors $13,450.00 from exempt assets and the trustee withdrew her objection. *Schmon-*

*sees,* 2001 WL 1699664 at *1–2, 2001 Bankr.LEXIS at *3.

**25.** The opinion does not state what the TSP loans were used for. There is no indication that the TSP loans were used to pay down unsecured debt.

ment plan. *Schmonsees*, 2001 WL 1699664 at *4, 2001 Bankr.LEXIS at *10–11. The additional contributions and loan repayments constituted 13% of his gross monthly income. Thus, 20% of his gross income was dedicated to his retirement, all at the expense of his creditors. The court concluded:

> Given Debtor's poor financial condition and the fact that, in effect, he is paying these 401(k) amounts to himself at the expense of his creditors, these payments are found to be unreasonable and excessive for an individual seeking Chapter 7 relief. In the context of a § 707(b) determination, such payments must be treated as disposable, available income for purposes of evaluating whether the debtor has the ability to repay his creditors. *See In re Taylor*, 212 F.3d 395 (8th Cir.2000).

*Id.* at *4, 2001 Bankr.LEXIS at *10–11.[26]

The totality of the circumstances leads one inexorably to the conclusion that the debtor was abusing the bankruptcy system. The family was a two-income family that accumulated its unsecured debt primarily in the husband's name.[27] They not only created exempt wealth in the equity in the house, but intended to keep the house and continue on the same spending habits and unsustainable life-style. Without a change, there was no end in sight and they would inevitably have found themselves returning to bankruptcy court for additional relief in the future. *See also Norris*, 225 B.R. at 333.

Schmonsees was not denied chapter 7 relief because he and his wife erred in purchasing a house that they could not afford. If improvident financial decisions were the test for substantial abuse, few debtors would be able to obtain chapter 7 relief. The difference was that Mr. Schmonsees and his wife recognized or should have recognized their mistake long before he filed bankruptcy. Once having recognized their mistake, they should have taken action to solve it and thereby avoided extensive debt. As in *Norris*, the debtor could have sold the house and moved to an affordable home. *See Norris*, 225 B.R. at 332. Instead, they inappropriately sought to keep the house and increase their exempt wealth. They did so over an extended period of time at the expense of their creditors.

 None of the Fourth Circuit bankruptcy court cases applied a *per se* rule disallowing voluntary retirement contributions or retirement loan repayments as legitimate expenses for § 707(b) purposes. While no single standard was enunciated, all considered the voluntary retirement contributions and repayment of retirement plan loans in the context of the circumstances of the case. In *Rodriguez* the debtor could effect a full repayment of his creditors within a very short period of time. This would have necessitated a short suspension of contributions to his retirement plan. In resolving the dilemma inherent in § 707(b) expressed by the Court of Appeals—providing a fresh start and stemming abuse of consumer credit—a short suspension of contributions without

---

26. *Taylor* is an Eighth Circuit case. The Eighth Circuit—unlike the Fourth Circuit—utilizes an ability to pay standard.

27. The opinion does not state whose debts were paid from the $77,000 unsecured loan. It really does not matter as long as it was not joint debt. *Bunker v. Peyton (In re Bunker)*, 312 F.3d 145 (4th Cir.2002) makes clear that

even in a joint case, tenants by the entirety property can only be administered for the benefit of the joint unsecured creditors. This case was filed and the $77,000 loan was incurred before *Bunker v. Peyton* was decided. What little joint debt that existed at filing was paid. See note 24, *supra*.

any tax ramifications militates against allowing the continuation of the contribution. *Green,* 934 F.2d at 571. *Rodriguez* teaches that not every bump in a person's financial road justifies bankruptcy relief. If a 10–month suspension of retirement contributions will result in the full payment of creditors, creditors should be paid.

*Norris* and *Jarrell* do not discuss the issue at length, but they do discuss retirement plan contributions in the context of the manner in which the debts were incurred and the reasonableness of the proposed budgets. These discussions would have been unnecessary if a *per se* rule automatically disallowed them.

 The United States Trustee urges the court to adopt the *per se* rule, that voluntary TSP contributions and repayment of TSP loans should always be disallowed. He argues that it is inequitable for the debtors to put aside money each month to fund their retirement or pay themselves back, while their unsecured creditors receive nothing. Motion at 5–6. He cites three cases, *In re Watkins,* 216 B.R. 394 (Bankr.W.D.Tex.1997), *In re Scott,* 142 B.R. 126 (Bankr.E.D.Va.1992) and *In.re Festner,* 54 B.R. 532 (Bankr.E.D.N.C. 1985).[28] With the exception of *Watkins,* however, all the cases are chapter 13 cases which consider whether retirement contributions are reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. 11 U.S.C. § 1325(b)(2). *Watkins* engrafts

this analysis onto § 707(b) thus conflating two separate analyses.

While there are § 707(b) cases that apply a *per se* rule, most are decided in circuits that have adopted the ability to pay rule, not the totality of the circumstances rule. In those circuits where the ability to pay standard controls, the bankruptcy courts apply a hypothetical chapter 13 test, that is, how much money and what percentage of unsecured debts would be paid to unsecured creditors in a hypothetical chapter 13 plan. A chapter 13 plan must provide[29] that "all of the debtor's projected disposable income to be received in the three-year period . . . be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). The term "disposable income" is further defined to mean all income not reasonably necessary to be expended "for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2)(A). Applying this definition in chapter 13 confirmation hearings, bankruptcy courts generally disallow voluntary contributions to retirement plans and repayment of loans to retirement plans.[30] "These expenditures are desirable from the debtor's standpoint, but they are certainly not necessary. Additional pension plans and stock purchases may be a wise investment which enhance an individual's financial security, but the debtor is not entitled to acquire them at the expense of unpaid creditors." *Festner,* 54 B.R. at 533. *Accord In re Fountain,* 142 B.R. 135, 136–137 (Bankr.E.D.Va.1992).[31]

---

28. *In re Fountain,* 142 B.R. 135 (Bankr. E.D.Va.1992) should be added as the companion case to *In re Scott.*

29. The requirement may be waived if neither the chapter 13 trustee nor any unsecured creditor objects to confirmation. 11 U.S.C. § 1325(b).

30. This rule is followed in chapter 13 cases without regard to whether the circuit has

adopted the totality of the circumstances test or the ability to pay test in substantial abuse cases arising under § 707(b).

31. There two other objections to retirement plan loan repayments in chapter 13 not directly applicable to § 707(b) cases. The first is the question of whether a retirement plan loan is in fact a debt or a claim. The second is whether repayment creates a classification problem that results in one class of credi-

The application of the *per se* rule disallowing retirement contributions and loan repayments is illustrated by *In re Austin,* 299 B.R. 482 (Bankr.E.D.Tenn.2003). The bankruptcy court, sitting in the Sixth Circuit applied the ability to pay standard which is set out in *In re Krohn,* 886 F.2d 123, 126 (6th Cir.1989)(abuse can be predicated upon either lack of honesty or want of need). *Krohn* states:

Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. *[In re] Walton,* 866 F.2d [981] at 984–85 [ (8th Cir.1989) ]; *[In re] Kelly,* 841 F.2d [908] at 914–15[9th Cir. (1988) ] (collecting cases). That factor alone may be sufficient to warrant dismissal. For example, a court would not be justified in concluding that a debtor is needy and worthy of discharge, where his disposable income permits liquidation of his consumer debts with relative ease. Other factors relevant to need include whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities.

*Krohn,* 886 F.2d at 126–27.

In applying the *Krohn* factors, *Austin* found that the debtor did not have a substantial ability to repay his debts based on his present spending habits. *Austin,* 299 B.R. at 486. However, he did have a

stable income and was eligible for chapter 13 relief. *Id.* The bankruptcy court concluded that the debtor's "expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities. In other words, the evidence leaves no doubt that the debtor could, with some belt-tightening, have a substantial ability to repay a large part of his indebtedness." *Id.* In reaching this conclusion, the court examined the debtor's contributions to his retirement plan. It stated:

[I]t appears that in this circuit funds contributed to savings or pension plans constitute "disposable income" that must be paid to creditors under a Chapter 13 plan that proposes less than a 100% payout to unsecured creditors. In *Harshbarger v. Pees (In re Harshbarger),* 66 F.3d 775, 777 (6th Cir.1995), the court held that repayments on a loan obtained from a retirement account represent disposable income that is not necessary for the maintenance or support of the debtors. Because repayments on loans from retirement plans are, in effect, retirement plan contributions, it is clear that the Sixth Circuit would likewise hold that such contributions also constitute disposable income that must be committed to a Chapter 13 plan. *In re Fulton,* 211 B.R. 247, 250–51 n. 1 (Bankr.S.D.Ohio 1997) (extending *Harshbarger* to pension plan contributions); see *Anes v. Dehart (In re Anes),* 195 F.3d 177, 180–81 (3d Cir.1999) (holding voluntary retirement plan contributions are not necessary for maintenance or support). Because funds that would otherwise be contributed to a retirement plan must be used to pay creditors un-

---

tors—the retirement plan creditors—receiving more than other unsecured creditors. 11 U.S.C. § 1322(b)(1) (unfair discrimination between classes). Frequently, the retirement

plan loan is proposed to be repaid in full while the other unsecured creditors are compromised. *See Scott,* 142 B.R. at 130–132.

der a Chapter 13 plan, such funds should be considered available to pay creditors for the purpose of the "substantial abuse" analysis. *In re Regan,* 269 B.R. 693, 696–97 (Bankr.W.D.Mo. 2001); *In re Cox,* 249 B.R. 29, 32 (Bankr.N.D.Fla.2000); *In re Cohen,* 246 B.R. 658, 665–67 (Bankr.D.Colo.2000); *In re Heffernan,* 242 B.R. 812, 818 (Bankr.D.Conn.1999); *In re Rodriguez,* 228 B.R. 601, 604 (Bankr.W.D.Va.1999); *In re Watkins,* 216 B.R. 394, 396 (Bankr. W.D.Tex.1997); *In re Bicsak,* 207 B.R. 657, 661–62 (Bankr.W.D.Mo.1997). Indeed, at least one court within the Sixth Circuit has applied *Harshbarger* in the Section 707(b) context. *In re Blum,* 255 B.R. 9, 15–16 n. 10 (Bankr.S.D.Ohio 2000); see also *In re Summer,* 255 B.R. 555, 559, 563–64 (Bankr.S.D.Ohio 2000) (citing *Harshbarger* and granting motion to dismiss, despite "no hint of dishonesty or lack of full disclosure," partly because of the continuation of deductions for pension plan contributions and loan repayments).

*Id.* at 486–87.

*Austin* sought to determine net disposable income for purposes of a § 707(b) determination. This determination was made by applying the disposable income requirements of chapter 13. 11 U.S.C. § 1325(b). Chapter 13 case law was utilized in this regard. *See In re Fletcher,* 248 B.R. 48, 50–51 (Bankr.D.Vt.2000). Chapter 13 case law automatically disallows voluntary contributions to retirement plans and repayment of loans from retirement plans. The chapter 13 rule was then applied for purposes of substantial abuse in chapter 7 and the voluntary contributions to retirement plans and repayment of retirement loans were disallowed. The analysis in *Austin* resulted in an additional $763.82 of net disposable income per month.[32] The court found additional belt-tightening adjustments that could be made to the debtor's budget.

Cases decided in circuits that have adopted the totality of the circumstances test for substantial abuse consider the circumstances of the case before allowing or disallowing the retirement contribution or loan repayment. *In re Aiello,* 284 B.R. 756 (Bankr.E.D.N.Y.2002) is an example.[33] It applied the test adopted by the Second Circuit in *New York City Employees' Retirement System v. Sapir (In re Taylor),* 243 F.3d 124 (2nd Cir.2001). In discussing *Taylor,* the bankruptcy court stated:

The Second Circuit recently addressed whether amounts contributed by the debtor to a pension or 401(k) plan must be included in the debtor's "disposable income" for the purposes of § 1325(b)(2). In *New York City Employees' Retirement System v. Sapir (In re Taylor),* 243 F.3d 124 (2d Cir.2001), the court declined to adopt a per se rule, finding instead that "[i]t is within the discretion of the Bankruptcy court judge to make a decision, based on the facts of each individual case, whether or not the pension contributions qualify as a reasonably necessary expense for that debtor." In making this determination, the

---

**32.** The debtor had $54.29 net disposable income according to his Schedules I and J. This included a deduction of $763.82 which was split almost equally between voluntary contributions and loan repayments to his 401(k) plan. Voluntary contributions and loan repayments each constituted about 6% of his gross income, for a total of 12% of his gross income. *Austin,* 299 B.R. at 484.

**33.** The Second Circuit adopted the totality of the circumstances test to determine whether a particular case constituted substantial abuse. *Kornfield v. Schwartz (In re Kornfield),* 214 B.R. 705 (W.D.N.Y.1997), *aff'd,* 164 F.3d 778 (2nd Cir.1999).

court held that "[T]he bankruptcy judge may evaluate any factors properly before the court, including but not limited to: the age of the debtor and the amount of time until expected retirement; the amount of the monthly contributions and the total amount of pension contributions debtor will have to buy back if the payments are discontinued; the likelihood that buy-back payments will jeopardize the debtor's fresh start; the number and nature of the debtor's dependents; evidence that the debtor will suffer adverse employment conditions if the contributions are ceased; the debtor's yearly income; the debtor's overall budget; who moved for an order to discontinue payments; and any other constraints on the debtor that make it likely that the pension contributions are reasonably necessary expenses for the debtor." *In re Taylor,* 243 F.3d 124, 130 (2nd Cir.2001).

*Aiello,* 284 B.R. at 762–63.

Before applying these factors, the bankruptcy court first noted that while the debtor's schedules showed a $700 a month voluntary contribution to his 401(k) plan, the maximum contribution permitted was $576 a month. *Id.* at 762. It later noted that the debtor quadrupled his voluntary "contributions to the maximum amount only one month prior to filing his chapter 7 petition." *Id.* at 764. This increased his pre-petition contribution rate which had been stable for 18 months from 5 to 6% of his salary to approximately 27%. *Id.* In discussing the allowable contribution level, the court considered

the relatively young age of the Debtor (25 years away from retirement age), his yearly income, the fact that he has no dependents, the fact that the contributions are voluntary and that the Debtor will not suffer any adverse employment conditions if the contributions are reduced, the fact that the Debtor will have no obligation to buy back pension contributions if the contributions are reduced, and the fact that prior to meeting with his bankruptcy attorneys, Debtor had been funding his pension plan in the amount of $140 per month, or 6% of his gross income

*Id.* at 763. The court allowed the continuation of the 6% contribution level, but allocated the balance to available net disposable income.[34]

Other reported cases have considered this issue in the § 707(b) context. *In re Mills,* 246 B.R. 395 (Bankr.S.D.Cal.2000) allowed a voluntary contribution to a retirement plan, but not the repayment of a loan from a retirement plan. *Mills* applied the test articulated in *In re Kelly,* 841 F.2d 908 (9th Cir.1988). Under *Kelly,* a debtor's ability to pay his debts, standing alone, supports a finding of substantial abuse. *Mills,* 246 B.R. at 403. "Whether a debtor has the 'ability to pay' his debts when due is determined by looking at the debtor's ability to fund a chapter 13 plan." *Id.* at 400. There the United States Trustee argued for the application of the chapter 13 *per se* rule. The court declined to do this, adopting instead a case-by-case analysis. *Id.* at 401. With respect to the voluntary contribution to the retirement plan, the court noted that the debtor was

---

**34.** It is important to note that the quadrupling of the retirement contribution on the eve of bankruptcy was considered in determining both the appropriate contribution level (the bankruptcy court considered the 18–month history as an indicator of an appropriate level) and the debtor's good faith. With

respect to the latter, the court stated, "the fact that Debtor increased his pension contributions to the maximum amount only one month prior to filing bankruptcy, when he had contributed only one-fourth of that amount for one and one-half years before, smacks of abuse." *Aiello,* 284 B.R. at 764.

56 years old, was contributing $302 per month and had accumulated only $9,000 in his retirement savings plan. *Id.* at 402. He was not a debtor who had "accumulated substantial amounts of equity in a retirement plan, which he desires to continue padding at the expense of his creditors." *Id.* Moreover, the debtor's schedules reflected "very modest budgeting on all scores." *Id.* The contribution was allowed.

However, the repayment of a loan to the same retirement plan was disallowed. The court again adopted a case-by-case analysis rather than a *per se* rule. The court found that he had given away half of the loan and had by this act demonstrated that the retirement fund was not necessary for his support or maintenance. *Mills*, 246 B.R. at 402–403.

*In re Cox*, 249 B.R. 29 (Bankr.N.D.Fla. 2000), an Eleventh Circuit bankruptcy court also considered the circumstances of the case and did not apply a *per se* rule. The Eleventh Circuit has not adopted a § 707(b) standard. *Cox*, 249 B.R. at 31. The bankruptcy court applied a modified ability to pay test, a test focusing on the debtor's ability to pay with other stringent factors.[35] The court reviewed all of the debtor's expenses, of which the voluntary retirement contribution was one, and concluded that there was sufficient net dispos-able income to fund a chapter 13 plan.[36] With respect to the retirement contribution, the court found that the debtor began making a $119.60 per month contribution after he filed bankruptcy and that he was not near retirement age. It disallowed the payment. It also noted the chapter 13 rule prohibiting such contributions.

■ The United States Trustee's argument for a *per se* rule is not particularly persuasive. The rule he espouses—*per se* disallowance of retirement plan contributions—is one that is applicable in chapter 13 cases where the court is determining whether a proposed chapter 13 plan satisfies the net disposable income test of § 1325(b)(1)(B). This case, however, is a substantial abuse case in a chapter 7 proceeding. The purposes of § 707(b) and § 1325(b)(1)(b) are different. Section 1325 is designed to assure that a chapter 13 debtor makes his best efforts in a chapter 13 plan. Section 707(b) is a gatekeeping provision designed to assure that chapter 7 is not abused. The abuse sought to be prevented is "a debtor seeking to take unfair advantage of his creditors." *Green*, 934 F.2d at 572.

■ There are different considerations. The consideration of the surrounding circumstances is more in keeping with

---

**35.** The four factors *Cox* relied on were "(1) whether the petition was filed because of a sudden illness, calamity, disability, or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor is eligible to adjustment of his debts through chapter 13; (4) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities; [and] (5) whether there is no other choice available to the debtor for working out his financial problems other than Chapter 7, and whether the debtor has explored or attempted other alternatives." *Cox*, 249 B.R. at 31–32; *See In*

re *Haddad*, 246 B.R. 27, 33 (Bankr.S.D.N.Y. 2000).

**36.** In addition to the voluntary retirement contribution, the court disallowed food expenses for the debtor's fiancé, her children and their boyfriends because they were non-legal dependents, a boat payment and $100 a month for his mother who, the debtor explained had "no money for food and lives in low-income housing." *Cox*, 249 B.R. at 32–33. This requirement derives from the statutory definition that requires the expenditures to be for "the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2)(A). Support to parents and siblings will be discussed further below.

*Green.* A *per se* rule is a finding that there are no circumstances under which a retirement plan contribution may be an allowable expense, that it is always inappropriate. It imposes a one size fits all paradigm. Substantial abuse implies some sort of culpability, some sort of action that crosses over a line of appropriateness. It permits consideration of surrounding factors so that abusive use of repayment of retirement plan loans and additional contributions to retirement plans can be separated from legitimate uses. The test under § 1325 is different. There Congress established a clear standard for determining net disposable income. It is premised on support and maintenance. While these elements are generally transferable to a determination of a debtor's ability to pay under § 707, they do not transfer identically. For example, § 1325 is limited to legal dependents. Whether one's mother is a legal dependant or not, it is not abusive to assist her if she needs assistance especially if she is worse off than the debtor. While it may not pass mustard under the statutory standard for § 1325, most people in the community would not consider such an expense—if not manipulated—to be abusive. This expense may be allowable in a § 707(b) analysis because it is not abusive.[37] Similarly, retirement contributions may be allowable under § 707(b) as not abusive, but statutorily impermissible under § 1325.

■ The cases discussed point out several considerations that distinguish abusive retirement contributions from non-abusive ones: the age of the debtor; the expected time until retirement;[38] the existence and extent of other retirement plans;[39] the amount of the contributions; and the debtor's overall budget. Courts have also considered when the contributions commenced and whether they were recently increased.[40] If a loan repayment is in issue, the net benefit to the creditors and the lost opportunity to the debtor should be considered. The balance—if significantly one way or the other—may affect whether the contribution is allowable. The use to which the loan was put may be a factor. If it was used to continue funding an extravagant lifestyle or was given away, there is less reason to allow it to be repaid.[41] Absent an abusive preference, if it were used to pay creditors in an effort to prevent bankruptcy, it may be allowed. Creditors would not be injured in those circumstances.

■ In this case, Mr. Vansickel is covered by a federal retirement plan and had $45,625.51 in his TSP plan as of September 30, 2003. He borrowed $32,194.37 against the plan.[42] If the loans are not repaid and

37. *In re Haddad,* 246 B.R. 27 (Bankr.S.D.N.Y. 2000) addresses a voluntary contribution to the debtor's mother. It was not allowed, principally because the surrounding circumstances cast doubt upon the debtor's claim that the funds were, in fact, going to her mother. *See also, Cox,* 249 B.R. at 32–33 (food expenses for debtor's fiancé, her children and their boyfriends disallowed; $100 a month for food for non-resident mother also disallowed).

38. Compare *Mills,* 246 B.R. at 402 (court allowed 56 year old debtor to continue finding his 401(k) plan at 10% of gross salary as a reasonably necessary expense), with *Cox,* 249 B.R. at 32 (debtor not near age of retirement—contribution to 401(k) not allowed).

39. *See Watkins,* 216 B.R. at 396 (debtors had four retirement plans).

40. *See Cox,* 249 B.R. at 32 (disallowed 401(k) contribution that began after filing chapter 7).

41. *See Mills,* 246 B.R. at 402–403 (debtor gave away money borrowed from retirement plan).

42. The loan amounts are in addition to the $45,625.51, which is invested in three stock and bonds funds.

he stops his contribution to the TSP, he will lose $49,760 and the creditors, in a chapter 13 plan, will gain $12,212. The use of the TSP loans was not entirely clear at the hearing. The loan made in April or May 2003, was part of an effort to resolve an issue with his former spouse over unpaid child support. It is not clear how all of the proceeds were used, but between $3,600 and $4,000 was used to pay the Navy Federal Credit Union, $800 to pay past-due rent to his landlord, and $2,000 for a down payment on a car when the lease on his old car expired.

Participation in the TSP program is an encouraged, well-accepted and long established financial activity. The debtor's voluntary contribution is modest. It is 3% of his gross income. *See Mills*, 246 B.R. at 402 (10% voluntary contribution to 401(k) plan was a reasonably necessary expense). It is not of recent origin. *See Cox*, 249 B.R. at 32 (contributions to 401(k) plan not allowed because debtor was not near retirement age and began his contributions after filing bankruptcy). The balancing of the benefit to the creditors and the burden to the debtor must be considered because of its clear imbalance. However, the debtor showed that only a nominal portion of the TSP loans were used to pay creditors. If most of the TSP loans had been used to pay creditors, the court would be more inclined to allow the loan payments for purposes of § 707(b). In that case, the

creditors would already have benefitted from the loan and the debtor would not have taken any undue advantage of them. The debtors' age is not clear. Retirement does not appear to be imminent but should be an increasing consideration. In weighing the factors, allowing one, but not both, is appropriate. Since the net benefit to the creditors is about the same for each but the cost to the debtor is far greater if the loan repayment is terminated, the amount of the voluntary contribution will be included in disposable income, but the loan repayments will not.[43]

### Do the debtors have the current ability to repay their debts?

The debtors' net income will be set at $5,269.65 per month [44] for purposes of this motion. This results in net disposable income of $304.65. A 36–month plan would be funded with $10,967.40. After deducting the chapter 13 trustee's fees and costs, there would be $10,200.00 available for creditors. The priority tax creditors will be paid in full, leaving $1,830.00 for general unsecured creditors, a distribution of 6.5%. If the TSP loan repayment were disallowed, the distribution to unsecured creditors would increase to 26.6%.[45]

### Will the debtors' ability to repay their debts continue into the future?

Even if the debtors have the current ability to make a payment to their unsecured creditors, the court must determine whether that ability is likely to continue

---

**43.** In a chapter 13 case, both would be disallowed.

**44.** The court used Mr. Vansickel's October 24, 2003 earnings statement, added back the net savings from voluntary TSP payment, the military deposit of $50.00 and the tax installment payment of $220.00 and increased the total by 4.1% to reflect the January 1, 2004 federal pay raise.

**45.** The chapter 13 trustee testified that he thought that the debtors could fund a 100%

plan. However, he assumed that all of the expenses that he identified would be disallowed and that not all creditors would file proofs of claims. It is not clear whether he considered his fees and expenses, the income tax implications arising from the termination of the TSP loan repayments or the priority status of the tax claims. Without a more detailed calculation that explains his assumptions and computations, the court will use its calculation as explained above.

for the next three years. In this case, Mr. Vansickel has been at his present employment for more than 13 years. His employment appears to be stable and there are no anticipated significant changes in the debtors' financial affairs.

### Other Factors

#### Was the bankruptcy petition filed because of sudden illness, calamity, disability, or unemployment?

*Green* suggests that the court should consider whether the petition was filed because of a debtor's sudden illness, calamity, disability or unemployment. No such illnesses, calamities, disabilities or other events causing an unanticipated interruptions of their income have occurred recently which had any significant impact on the debtors that caused the filing of the petition in this case.

#### Did the debtors incur cash advances and make consumer purchases far in excess of their ability to repay them?

The next factor to be considered is whether the debtors incurred cash advances and made consumer purchases far in excess of their ability to repay. The United States Trustee argued that:

> The debtors' Schedule F speaks for itself. The present case appears to be one involving individuals who, for whatever reason, have overextended their ability to meet their current obligations. The debtors voluntarily incurred consumer debts beyond their ability to pay them.

Motion at 5.

The difficulty with the United States Trustee's argument is that it is simply not supported by evidence. While Schedule F says that there are debts, it says nothing more. It does not say that the debts are extraordinary in amount. They are not. The unsecured debts total $28,222.00, an amount that falls well within the range of many chapter 7 petitions. Seven of the credit card debts total $5,409.00, an average of $772 each. The largest of these is $1,394.00. There is no evidence that any of these are at the credit limit of the account. The two largest creditors are Toyota with a claim of $7,868.00 and Wells Fargo with a claim of $7,449.00. The next largest claim is under $5,000.00 There is no evidence as to what was purchased on the credit cards and whether the purchases were luxury goods or services or were routine expenditures. The total is not by any measure extraordinary.

██ If this factor is broadly interpreted, all debtors start out with it weighing against them. All debtors have incurred obligations in excess of their ability to repay them. The very fact that they filed bankruptcy is evidence of this. Such a broad interpretation is contrary to the presumption in favor of relief contained in § 707(b). This factor is more properly an examination of the nature of the debt incurred and of the debtor's reasonable expectations at the time that the obligations were incurred. Did the debtor have a reasonable expectation of paying the obligation, or repaying the debt? Were the obligations for luxury goods or services? Were they consistent with the debtor's financial status in the community? Was there a sudden unexplained change in spending patterns? These questions are directed to the fundamental purpose of § 707(b), whether the bankruptcy system is being used by a debtor "to take **unfair** advantage of his creditors." *Green,* 934 F.2d at 570 (emphasis added).

Here, it cannot be said that the debts were excessive. They are, in fact, relatively modest. Nor can it be said that the debtors did not have a reasonable expectation of repaying them when they were incurred. It is not known over what time

the debts were incurred; whether regular payments were maintained, and if so, how long; whether the purchases were for luxury goods or services; or whether one credit card was being used to pay others. To make that finding, the court would need additional evidence of what was purchased and when. The statutory presumption is in favor of the relief requested by the debtor. The burden of proof is on the United States Trustee. In the absence of evidence, the court cannot find that the debts were excessive and beyond the debtors' ability to pay.

### Do the debtors' schedules and statement of current income and expenses reasonably and accurately reflect their true financial condition?

This factor was discussed above when the court was determining the debtors' net disposable income. There is a second aspect to this consideration that does not relate to the determination of net disposable income and should be discussed separately. The United States Trustee argued that the answer to Question 3 on the Statement of Financial Affairs was incorrect. That question requires the debtors to list all payments on loans or other debts aggregating more than $600 to any one creditor made within 90 days before the commencement of the case. The debtors said that there were none. Mr. Vansickel acknowledged that he borrowed money from his TSP account in June, 2003. The loan was used, in part, to pay creditors. While the United States Trustee points to this as an inaccuracy, it is not clear if it was, and if it was, the extent of the misstatement. While the payments most likely occurred within the 90–day preference period, it is unclear whether any single creditor was paid more than $600. This was an error but not one that indicates the schedules are substantially inaccurate.

### Was the petition filed in good faith?

The United States Trustee does not assert that the petition was filed in bad faith. However, the court must consider Mr. Vansickel's resignation from his second job at the end of 2003, about four months after the petition was filed in this case. While this was addressed when reviewing the debtors' ability to pay, it also has overtones of bad faith. A debtor ought not be able to avoid his obligations to his creditors by voluntarily being underemployed or by manipulating his overtime or part-time employment. If a debtor regularly works overtime or holds a part-time or second job before filing bankruptcy and intends to continue such employment, he should not be permitted to temporarily decline overtime or temporarily stop working at his part-time or second job simply to depress his income while his bankruptcy petition is pending. It is a matter within the control of the debtor that can be manipulated by the debtor to the disadvantage of his creditors. A debtor in such circumstances seeks to take unfair advantage of his creditors and to unfairly shield himself from his creditors.

In this case, Mr. Vansickel made extraordinary efforts to earn money. The second job was practically a second full-time job. He worked as a private security officer for 32 hours a week—two shifts on Saturday and two shifts on Sunday—for an extended period of time. He worked every weekend until July, 2003 when he reduced his work schedule to three out of every four weekends. He testified that he took on the second job so that he could pay his former wife past-due child support. He explained that he had decreased his child support payments as his children reached age 18. When the last one reached 18 and payments were no longer due, his former wife asserted that he owed the difference between what he had paid

and the full amount set forth in the divorce decree or property settlement. That is, she asserted that he had improperly decreased the child support payments as his children reached 18. He litigated this matter in Maryland and lost. Faced with the enforcement powers of the state court, he made a payment from funds borrowed from his TSP and took the second job. He completed the payments some time in 2003 and later resigned from his second job. There is no indication that before the state court entered its order he ever held a second job. The efforts were extraordinary. There was no bad faith in resigning the second job so that he could return to a more normal life.

### Weighing the Factors

The Fourth Circuit held that no single factor, including the ability of a debtor to repay his debts, is determinative in a § 707(b) hearing. *Green*, 934 F.2d at 572. There is a presumption in favor of the relief requested by the debtor. The burden of proof lies with the United States Trustee. While the Fourth Circuit adopted "the totality of the circumstances test as the appropriate analysis to be followed in determining whether substantial abuse exists," it did not apply the test to the facts presented in *Green*. *Id.* at 573. On remand, it recommended that the bankruptcy court review several cases to assist it in making its determination. The court stated:

> In making a judgment on the question of substantial abuse, the court may find it helpful to consult the following cases: *In re Grant*, 51 B.R. 385, 396 (Bankr. N.D.Ohio 1985) (citing debtor's "free-wheeling spending," which included monthly entertainment expenses of $450 and Christmas expenditures of $900); *In re Peluso*, 72 B.R. 732, 738 (Bankr. N.D.N.Y.1987) (debtor with substantial income altered his monthly obligations

in statements to the court at least three times; filing of petition was not precipitated by any injury, illness, or loss of employment); *In re Shands*, 63 B.R. 121, 123 (Bankr.E.D.Mich.1985) (debtor's choice of Chapter 7 over Chapter 13 was not motivated by inability to afford repayment but by some personal motive, where debtor was voluntarily paying favored creditors a weekly amount greater than her claimed excess income).

*Id.*

While there have been additional cases since *Green* was decided, the cases the Court of Appeals cited assist in more fully understanding the Fourth Circuit's totality of the circumstances test. In *Grant*, the bankruptcy court closely examined the debtors' income and expenses. It found that the debtors could fund a 68% repayment plan over five years, which would be a 41% repayment plan over three years. *In re Grant*, 51 B.R. at 388. The debtors' pre-petition purchases "exhibit the extravagance of their life-style, and utter disregard of sound financial planning." *Id.* at 388. The court characterized the debtors' proposed post-petition budget as "free-wheeling spending [that] is likely to put the debtor in need of additional relief after several years." *Id.* at 396. The sense conveyed is one of irresponsible, feckless consumers whose life-style was funded by unsuspecting creditors. For example, the debtors had leased a 1982 240D Mercedes but, despite their apparent financial distress, had recently replaced it with two new leased cars, both 1985 models. (The bankruptcy was filed on February 7, 1985.) No effort had been made to curb their spending. No effort had been made to pay their creditors. Their schedules were inaccurate.

In *Peluso* the bankruptcy court examined the debtor's pre-petition spending

habits and his proposed post-petition budget. It concluded, "The bottom line is that Debtor voluntarily incurred consumer debts beyond his ability to pay them. This destructive financial pattern does not appear to have an end in sight." *Peluso,* 72 B.R. at 738. The court examined the accuracy of the debtor's schedules and found that the schedules of income and expense were inaccurate. Despite three amendments, the expenditures were still overstated. The budget proposed that the debtor make voluntary payments for the benefit of his adult children and to protect a co-signer on a promissory note. *Id.* If these expenses were eliminated and others reduced, the debtor could have funded a chapter 13 plan that would have paid his creditors in full over five years. *Id.* at 739. A 36–month plan would have resulted in a 60% distribution to creditors. There were no unexpected expenses and no calamities. There was no explanation as to how the debtor came to be in his financial straits. *Peluso* focused not only on the debtor's ability to fund a chapter 13 plan but also the absence of good faith.

*Shands* presents a different scenario. Here the debtor had the ability to repay all of her debts within 33 months, however, she did not want to pay a debt to her former husband. In fact, she and her present husband had borrowed $19,000 from their credit union to payoff almost all of their debts. That loan was being paid from her present husband's paycheck by an allotment. She had only two small debts. Shortly, after they borrowed the $19,000, Mrs. Shands former husband demanded payment of $6,000 which he said was due to him from their divorce settlement. She was unhappy that their home had gone to foreclosure, blamed him and felt that he had lost the equity, half of which would have gone to her. She waited for the preference period to expire on the $19,000 loan before she filed bankruptcy.

Her former husband filed a non-dischargeability complaint. In her answer she stated that "The Debtor does admit that the main purpose of filing her bankruptcy was to discharge her debt to her former husband." *In re Shands,* 63 B.R. at 123. The bankruptcy was dismissed for substantial abuse. *Id.* at 124; *See also In re Kestell,* 99 F.3d 146 (4th Cir.1996) (finding substantial abuse where debtor sought to avoid paying former wife while paying all other financial obligations). In both *Shands* and *Kestell* there was clear bad faith.

*Green* has been applied in more recent cases. *In re Stewart* is one. In this case, the debtor sought to discharge significant obligations to his former wife and her parents. The debtor had graduated from medical school and was in a fellowship program. He earned $35,000 a year but had clear prospects of increasing that to several hundred thousand dollars a year. While the bankruptcy followed the debtor's divorce, there were no decline in income. He elected to enter a fellowship program that reduced his current income quite significantly but promised to increase his future income quite significantly. The debts to his former wife and her parents had been incurred to support him during his education. The Bankruptcy Appellate Panel affirmed the bankruptcy court's dismissal for substantial abuse. Here, there was voluntary underemployment that was intended to be temporary. The debtor's future ability to repay all his debts was well established and those debts had been incurred in an effort to permit him to realize his ambition and his future income.

The last case to be considered is *In re Norris* which was considered earlier in connection with the retirement plan loan repayment. The bankruptcy court concluded that the debtors could support a 47% repayment plan in a 3–year chapter

13 plan. It found that the debtors' filing was not caused by unforeseen calamities. It found that the debts had been mounting for a decade but noted that two years before the filing Mr. Norris's income had dropped from $70,000 to $48,000 when his employer's business was purchased. The new owner changed his compensation package from a commission basis to a salary basis resulting in a loss of income. The court did not relate that income loss to the filing. It was concerned that although the debtors could have moved much earlier to a less expensive home and avoided the financial problem, they decided not to.[46] As a result, they were seeking to discharge all of their unsecured creditors while paying their secured creditor. There was some, but not significant, concern over the accuracy of the debtors' schedules. The credit card debt was about $90,000, "most of which resulted from using one credit card to pay off another, while using still other cards to pay for living expenses." *Norris*, 225 B.R. at 333. During this time, there was no end in sight to the debtors' spending habits. The budget remained excessive and unreasonable. The court did not find bad faith. The debtors did not run up a large amount of debt just prior to filing or lead an extraordinary lavish lifestyle. They did not manipulate their schedules or attempt to mislead the court. They had sought alternatives to bankruptcy. Overall, the court was "left with a rather close decision." *Id.* at 334. It found that there was substantial abuse. *Id.*

In this case, there was no single precipitating event beyond the control of the debtors such as death, illness, divorce or loss of employment. The absence of this factor may not be as significant as its presence. If it is present, it tends to negate fecklessness and recklessness. It tends to be evidence that the debtors were not living an extravagant or luxurious lifestyle that they could ill afford and should not have maintained. Death, illness, unemployment and divorce are part of life's risks, part of the risks borrowers run when borrowing money and lender's run when lending money. Absent more, the presence of those calamities tends to favor the relief the debtor seeks. But the opposite is not necessarily as meaningful. It may mean that the debtors lived a typical life but made mistakes from which they could not recover financially. The absence of a calamity may also mean that the debtors were leading an excessive lifestyle at the expense of their creditors. The weight accorded must be tempered by the fact that there is a separate consideration concerning whether the debtors incurred consumer debt far in excess of their ability to repay it. It should not, however, be used as a proxy for that same factor. That factor is a separate factor that should be separately considered and not considered twice under the guise of a different rubric. The presence of a calamity is probably more important than the absence of a calamity.

In this case, the debtors have an ability to pay some of their debts, but the percentage of repayment is lower than in the cases discussed above.[47] In those cases,

---

**46.** The house was described as "a large and expensive home." *Norris,* 225 B.R. at 333.

**47.** One of the criticisms of the ability to pay test is that it does not itself establish the threshold of the ability to pay that is necessary for there to be substantial abuse. It would seem that a threshold is implied by the ability to pay test so that all similarly situated debtors are treated the same. If that threshold were, for example, an ability to pay 50% of the scheduled debts, why is a case with a 49.9% repaying to creditors not abusive while a case with a 50.1% ability to repay is abusive? If there is no threshold then either similarly situated debtors are not treated the

the 3–year repayment percentages were 41% (*Grant*), 47% (*Norris*), 60% (*Peluso*), and 100% (*Shands*).[48] Here the estimate is 6.5%, 26.6% if the TSP loan payments were terminated.

While there was no sudden illness, calamity, disability or other event beyond the control of the debtors that disrupted their income and gave rise to the petition, there is no indication that the debts were incurred recently or that there was any suspicious activity associated with them. Most of the credit card debt was relatively modest. One of the largest debts arose from a repossessed vehicle. There was no extravagant or lavish life-style. The debtors live modestly. There is no evidence that one credit card was used to pay another one which would suggest that the debtors were knowing incurring debt that they could not pay.

The debtors have been honest with the court. Their schedules and statement of financial affairs are substantially accurate except for the troubling and unexplained $494.00 insurance deduction. The sole amendment was to reflect a legitimate post-petition change in employment and a tax installment payment. They have acted in good faith in seeking remedies to their financial problems. Before resorting to bankruptcy they sought credit counseling.

In weighing the factors, the ability to pay is relatively modest. The other factors are not indicative of substantial abuse. While the court is troubled by the misstatement of the insurance deduction,[49] when considered together with all of the other factors, it does not shift the overall weight that otherwise favors the debtors.

### Conclusion

In examining and weighing all the circumstances of this case, the court is satisfied that the Vansickels' resort to chapter 7 is not a substantial abuse of the Bankruptcy Code. They are not taking unfair advantage of their creditors. The United States Trustee's motion will be denied.

---

same or other factors are being considered *sub silento*.

**48.** In *Grant* and *Peluso*, the bankruptcy courts used 5–year terms. Those repayment percentages were 68% (*Grant*) and 100% (*Peluso*). *Norris* used a 3–year term. The 3–year term is more appropriate for most substantial abuse motions. For chapter 13 purposes, the usual plan term is three years. The court may approve up to a five-year term "for cause." 11 U.S.C. § 1322(d). This court computed the equivalent 3–year repayment percentages for *Grant* and *Peluso*. It is not clear what, if any, impact this reduced period would have had on the outcomes of those cases.

**49.** There are other remedies for inaccurate schedules, for example, a debtor may be denied a discharge under § 727(a)(4). The misstatement in this case probably would not rise to that level. A § 707(b) motion should not be used as a substitute for a § 727 discharge complaint. A single material misrepresentation may result in the denial of a discharge under § 727(a)(4), but the presence of a single factor in the multi-factor totality of the circumstances analysis does not necessarily result in dismissal under § 707(b). There are also different procedural processes and protections. A § 727 complaint is brought as an adversary proceeding under F.R.Bankr.P. 7001(4) while a § 707(b) motion is brought as a contested matter under F.R.Bankr.P. 9014.